STATE OF NORTH CAROLINA v. BYRON LAMAR WARING

No. 525A07

(Filed 5 November 2010)

## 1. Criminal Law— motion to suppress—pretrial ruling— preliminary

The trial court's denial of a motion to suppress in a first-degree murder prosecution was subject to plain error review where defendant did not object at trial. Although defendant argued that the trial judge was bound by a hearing judge's ruling on the suppression motion, a pretrial motion to suppress is preliminary because different evidence may be admitted at trial.

## 2. Confessions and Incriminating Statements— first contact with officer—not custodial

The evidence supported the findings in the pretrial suppression hearing of a first-degree murder prosecution that the officer who first made contact with defendant was not privy to the details of the investigation and would have allowed defendant to walk away if defendant had so chosen.

## 3. Confessions and Incriminating Statements— pretrial suppression hearing—findings—voluntarily going with detectives

The finding of the trial court in a pretrial suppression hearing that defendant voluntarily agreed to accompany detectives to the Raleigh Police Department was supported by the evidence.

## 4. Confessions and Incriminating Statements— pretrial suppression hearing—findings—door of interview room not guarded

Competent evidence in a pretrial suppression hearing supported the court's findings that no one guarded the door during the initial interviews of defendant in a police department. The trial court's resolution of conflicting evidence will not be disturbed on appeal.

## 5. Confessions and Incriminating Statements— initial interrogation—custodial

Under the totality of the circumstances, a reasonable person in the position of defendant when he was originally detained

would not have believed that he was under arrest or was restrained in his movement to a significant degree.

**6. Constitutional Law— right to silence—police car ride—no clear invocation of right**

Defendant's right to silence was not violated during a three-hour police car ride in which defendant helped officers recover evidence. Defendant's statement of scruples against snitching was not a clear invocation of his right to silence.

**7. Constitutional Law— effective assistance of counsel—limited intellectual functioning—no evidence presented**

Defendant was not deprived of his right to the effective assistance of counsel where his lawyers failed to present evidence of his limited intellectual functioning at a hearing to suppress his statements to officers. The assignment of error was dismissed without prejudice to defendant's right to reassert it in a post-conviction motion for appropriate relief.

**8. Jury— selection—peremptory challenges—racial discrimination—*Batson* claim**

There was no error in a capital first-degree murder prosecution where the trial court effectively denied defendant's *Batson* challenge by allowing the State's peremptory challenge. The trial court applied the correct standard, despite a *lapsus linguae*.

**9. Jury— selection—peremptory challenge—*Batson* claim**

The trial court did not err by denying defendant's *Batson* claim during jury selection in a capital first-degree murder prosecution. The trial court found that the prosecutor's proffered explanation satisfied his burden of establishing nondiscriminatory reasons for the challenge and that defendant had failed to prove that the State acted in a racially discriminatory manner. Trial courts are encouraged to make findings when necessary to make clear aspects of the jury selection that are not preserved on the cold record.

**10. Jury— capital voir dire—beliefs not clear—challenge for cause**

The trial court did not abuse its discretion by allowing the State's challenge for cause in a capital first-degree murder prosecution where a prospective juror's beliefs about the death penalty could not be pinned down.

**11. Constitutional Law— death qualifying jury—no constitutional violation**

There was no constitutional violation in death qualifying a jury.

**12. Jury— capital voir dire—prosecutor's statements to jury—no presumption favoring life sentence**

North Carolina law does not establish a presumption in favor of a life sentence in a capital sentencing proceeding, and the trial court correctly barred defense counsel's statement to that effect during jury selection.

**13. Jury— capital—voir dire—prosecutor's omission—remedied by instructions**

Any omission by the State in its statements during a capital *voir dire* concerning aggravating circumstances were remedied by the trial court's correct instructions.

**14. Jury— capital voir dire—unanimity—life sentence**

There was no error during jury selection for a capital first-degree murder prosecution where the prosecutor indicated that the jury had to recommend a life sentence unanimously. Although defendant argued that the court would impose a life sentence if the court could not agree, the jury is not to be instructed about the result that follows the failure to reach a unanimous sentencing recommendation.

**15. Evidence— autopsy—photographs—admissibility**

The trial court did not abuse its discretion in a first-degree murder prosecution by allowing the State to introduce for illustrative purposes autopsy photographs of the victim.

**16. Evidence— recross-examination—objection sustained—no abuse of discretion**

Sustaining the State's objection to defendant's recross-examination of law enforcement officers was not an abuse of discretion in light of defendant's admissions.

**17. Criminal Law— prosecutor's argument—supported by evidence**

There was no gross impropriety in the guilt-innocence portion of a first-degree murder prosecution where the prosecutor argued that a mark on the victim's forehead in an autopsy photograph was made by defendant's shoe. Although the pathologist

did not identify the cause of the mark, the argument was supported by the evidence.

## 18. Criminal Law— prosecutor's opinion—not grossly improper

The trial court did not err by failing to intervene *ex mero motu* in the guilt-innocence phase of a first-degree murder prosecution where the prosecutor expressed his opinion that the evidence of guilt was overwhelming. Defendant did not object, and the argument was not grossly improper.

## 19. Criminal Law— prosecutor's opinion—intent to kill

The trial court did not err by failing to intervene *ex mero motu* in the prosecutor's closing argument in the guilt-innocence phase of a first-degree murder prosecution where the prosecutor argued that, in his opinion, stabbing the victim in the neck was an indication of intent to kill.

## 20. Criminal Law— prosecutor's comment—accomplice's conduct

The trial court did not err by failing to intervene *ex mero motu* in a first-degree murder prosecution where the prosecutor commented that an accomplice's mode of entry into the victim's apartment constituted burglary. Defendant did not show that the comment was fundamentally unfair or affected the outcome of the trial.

## 21. Constitutional Law— effective assistance of counsel—failure to timely object

The failure of a first-degree murder defendant's counsel to raise timely objections was not ineffective assistance of counsel. The evidence against defendant was overwhelming and there was no probability that the outcome was affected.

## 22. Criminal Law— prosecutor's argument—motive

The trial court did not err by failing to intervene during a first-degree murder prosecution where the prosecutor argued that defendant and an accomplice killed the victim to eliminate her as a witness.

## 23. Criminal Law— acting in concert—instructions

The trial court properly instructed the jury on acting in concert in a first-degree murder prosecution. Although defendant argued that these instructions did not require the jury to find intent by defendant, they were virtually identical to those in *State v. Barnes*, 345 N.C. 184.

**24. Sentencing— capital—prosecutor's opening statement— victim's family**

References to the victim and her family in the prosecutor's opening remarks in a capital sentencing proceeding, examined in the context of defendant's opening remarks, were a correct summary of the nature of the penalty proceeding and forecast of the evidence and were not improper.

**25. Constitution Law— effective assistance of counsel—failure to object to argument**

There was no ineffective assistance of counsel arising from the failure to object to a prosecutor's opening statement that was not improper.

**26. Sentencing— capital—cross-examination of defendant's expert—malingering during tests**

The trial court did not abuse its discretion in a capital sentencing proceeding by overruling defendant's objection to the State's cross-examination of defendant's expert about whether defendant was malingering during psychological tests. Defendant's mental capacity and possible neurological and psychological disorders were key issues and nothing in the record indicates that the questioning was in bad faith.

**27. Sentencing— capital—questioning of defense expert— unethical conduct**

Even if defendant had properly preserved the questions for appeal, the trial court did not err by failing to intervene *ex mero motu* in a capital sentencing proceeding where the prosecutor asked defendant's expert about unethical conduct and defendant's potential for future violence.

**28. Sentencing— capital—defendant's I.Q.—lay testimony**

The trial court properly sustained the State's objection to lay opinion testimony about defendant's intelligence in a capital sentencing proceeding. The witness was allowed to testify that defendant suffered a "lower I.Q.," but was not allowed to give a specific I.Q. range.

**29. Sentencing— capital—prosecutor's closing argument— multiple circumstances—distinct evidence**

The trial court did not err by failing to intervene in a capital sentencing proceeding during the prosecutor's closing argument

concerning three aggravating circumstances where there was substantial and distinct evidence of each circumstance. The failure to object was not ineffective assistance of counsel.

### 30. Sentencing— failure to give instruction—plain error review—not available

Plain error review was not available for the failure to give an instruction where defendant did not make a timely request for the instruction. The trial court did not have a duty to give the instruction in the absence of a request. The record was undeveloped about why the request was not made and an ineffective assistance of counsel issue was denied, but could be raised in a post-conviction proceeding.

### 31. Sentencing— capital—prosecutor's closing argument—personal opinion

The trial court did not err in a capital sentencing proceeding by allowing the State to make closing arguments expressing a personal opinion. While the prosecutor's argument contained improper material, the comments were a far cry from the type of inflammatory argument condemned in other cases, did not trigger an objection, and were not so grossly improper as to require the trial court to intervene *ex mero motu*.

### 32. Sentencing— capital—prosecutor's comments—ridiculing defense experts—not grossly improper

In a capital sentencing proceeding, the prosecutor's comments on defense experts may have been meant as ridicule, but were ambiguous and confusing in context, did not trigger an objection, and were not so grossly improper as to require the court to intervene *ex mero motu*.

### 33. Sentencing— capital—prosecutor's closing argument— efforts to help victim

The prosecutor did not argue outside the record and attempt to inflame the jury in a capital sentencing proceeding with an argument about the attempt of a neighbor to help the victim. The prosecutor used the victim's experience as a means of conveying the victim's suffering and the heinous, atrocious, or cruel nature of the crime.

STATE v. WARING

[364 N.C. 443 (2010)]

**34. Sentencing— capital—prosecutor's closing argument— imaginary conversation with victim's father**

A prosecutor's closing argument in a capital sentencing proceeding was not so grossly improper as to require intervention *ex mero motu* where the prosecutor related an imaginary conversation with the victim's father. The prosecutor never indicated that the conversation had occurred and, in context, the argument was a permissible reminder from a different perspective of how the victim suffered and the nature of defendant's actions.

**35. Sentencing— capital—prosecutor's closing argument— gang involvement**

The prosecutor's closing arguments in a capital sentencing prosecution regarding defendant's gang involvement were supported by the evidence and were not improper.

**36. Sentencing— capital—prosecutor's closing argument— credibility of defense case—proper inferences**

There was no gross impropriety in a capital sentencing proceeding where the prosecutor argued that defendant's case for mitigation was a lie. The prosecutor's argument appropriately drew inferences from properly admitted evidence and was not so grossly improper as to require the trial court to intervene *ex mero motu*.

**37. Sentencing— capital—prosecutor's closing argument—no cumulative error**

There was no cumulative error in a prosecutor's closing argument in a capital sentencing proceeding where the arguments were not in error or did not rise collectively to the level of reversible error.

**38. Sentencing— capital—peremptory instructions—not given—controverted evidence**

The trial court did not err in a capital sentencing proceeding by refusing to instruct peremptorily on the (f)(2),(f)(6), and (f)(8) mitigating circumstances where the evidence supporting their submission was controverted.

**39. Sentencing— capital—mitigating circumstances—no significant criminal activity—properly submitted**

The trial court did not err in a capital sentencing procedure by submitting the (f)(1) mitigating circumstance (no significant

history of criminal activity) over defendant's objection. The evidence was limited to minor offenses and the trial court reasonably determined that a rational jury could conclude that defendant had no significant history of criminal activity.

### 40. Sentencing— capital—nonstatutory mitigating circumstances—peremptory instruction

The trial court did not err in a capital sentencing proceeding by failing to give peremptory instructions on nonstatutory mitigating circumstances where the evidence did not support the instructions.

### 41. Sentencing— capital—mitigating circumstance—defendant's mother—peremptory instructions not given

Any error in a capital sentencing proceeding in not giving peremptory instructions on mitigating instructions regarding defendant's mother was harmless. Several of the circumstances were controverted, and, while the court erred by not giving a peremptory instruction in one instance, other peremptory instructions relating to defendant's mother were given and the jury did not find mitigating effect.

### 42. Sentencing— death penalty—proportionate

The death penalty was proportionate where the jury found three aggravating circumstances, the evidence fully supported each aggravating circumstance, and nothing in the record suggested a sentence imposed arbitrarily or under the influence of passion or prejudice. Defendant participated in a brutal, prolonged, and merciless killing.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Paul G. Gessner on 9 July 2007 in Superior Court, Wake County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 9 September 2009.

*Roy Cooper, Attorney General, by Joan M. Cunningham and Derrick C. Mertz, Assistant Attorneys General, for the State.*

*James P. Cooney III and Mary S. Pollard for defendant-appellant.*

**STATE v. WARING**

[364 N.C. 443 (2010)]

EDMUNDS, Justice.

In the early morning hours of 8 November 2005, Raleigh police were dispatched to an apartment complex near Walnut Creek Parkway to investigate a report of rape and possible assault. Officer David Naumuk was the first to arrive at the scene, along with members of the Raleigh Fire Department. As Officer Naumuk sought to locate the correct building in the complex, he saw a white male, later identified as Andrew Bennett Pipkin (Pipkin), who was holding a telephone to his ear and running toward the firefighters while calling for help. Officer Naumuk asked Pipkin to direct him to the victim, then followed him through a breezeway and down a set of stairs.

When Officer Naumuk reached the bottom of the stairs, he found Pipkin kneeling beside the victim, who was later identified as Lauren Redman, a twenty-three-year-old white female. Pipkin's hand was on the victim's stomach, attempting to hold in her intestines. She was sitting up "Indian style" on the sidewalk, covered in blood, with her arms stretched out over her knees, her head slumped over, and her hair completely covering her face. As EMS and fire personnel began to attend to the victim, Officer Naumuk guarded the door to the victim's apartment.

When Police Sergeant Munn arrived at the scene, he and Officer Naumuk entered the apartment to conduct a preliminary search. No one was inside, but they observed a large quantity of blood on the floor in the center of the living room. All the windows in the apartment were closed with no signs of forced entry.

At defendant's trial, Pipkin testified that he had been in an apartment above the victim's apartment, preparing for bed at approximately 2:20 a.m. after watching *Monday Night Football*. He heard loud classical music coming from the other side of the breezeway, followed a few moments later by knocking on the walls and cries for help. He initially assumed that the noise might be from intoxicated college students in one of the nearby apartments. However, when the noise continued, he dressed and opened his apartment door. He heard a girl crying out for help from the floor below, asking him to come down. When Pipkin went downstairs, he found the victim kneeling in the breezeway in a pool of blood, wearing no panties and with her nightgown pulled up. She was knocking on the door of Apartment B, the apartment just beneath Pipkin's. Across the breezeway he could see "a lot of blood" in Apartment A. The victim appeared to be holding a towel to her stomach, but on closer exami-

nation, Pipkin realized she was cut open and what he first thought was a towel were her exposed intestines.

The victim told him she had just been attacked, so Pipkin immediately ran back to his apartment to call 911. While making that call, Pipkin returned to the victim and asked who had injured her. According to Pipkin, she responded either, "[T]wo black men," or "held up two fingers to indicate the number." Because loud classical music coming from the victim's apartment was interfering with the call, the 911 dispatcher directed Pipkin to turn off the sound. At the further direction of the 911 dispatcher, Pipkin pressed a towel against the victim's wound, then held up the victim's back to relieve her pain. He remained holding her for about ten minutes until Officer Naumuk arrived.

When the paramedics reached the scene, Pipkin was with Officer Naumuk, still holding the towel to the victim's stomach. A paramedic testified that "[t]here was quite a bit of blood on the ground" and that the victim "did not appear to have any signs of life." After unsuccessfully performing CPR, the paramedics placed her in an ambulance, where they noticed tape and other material wrapped around her neck like a scarf. They also observed what appeared to be at least ten life-threatening wounds. The victim was pronounced dead in the ambulance at 2:42 a.m.

A state medical examiner later determined the victim's death resulted from multiple injuries. Grouping those injuries, the examiner found five stab wounds, abrasions, and contusions to the victim's head and neck; hemorrhages in the whites of her eyes associated with lack of oxygen that could have resulted from her mouth and nose having been covered; twenty-three stab wounds to her torso, including seventeen superficial wounds or "flecks" that were consistent with having been pricked by the tip of a knife; hemorrhaging in her abdominal cavity; contusions and incised wounds on her upper extremities; contusions of the torso; abrasions of her knees; and an abrasion of the wall of her vagina.

As detailed below, police investigators identified Byron Lamar Waring (defendant), a nineteen-year-old African-American male, as a suspect. On 9 November 2005, detectives located defendant at his 5120-A Vann Street residence in West Raleigh. Defendant agreed to accompany detectives to the Raleigh Police Department for an interview, where he made a series of statements on 9 November and 10 November 2005. The last two of these statements, one narrated to

jurors by investigators, the other tape-recorded and in defendant's own voice, were admitted at trial.

According to these statements, sometime during the late evening of Monday, 7 November and the early morning of Tuesday, 8 November 2005, defendant and Joseph Sanderlin (Sanderlin) walked from defendant's Vann Street apartment to the victim's apartment complex, taking with them duct tape they had purchased shortly before setting out. Defendant said that the two of them went to the victim's apartment "to do a favor for a friend of mine," which was "just to go get the money." When they arrived, defendant knocked on the door and told the victim that Brad Sasser had sent him over to retrieve a cord for Sasser's video game system along with some compact discs.[1] The victim responded that she thought she had already given those things to Sasser, then started looking in the apartment's living room. As she turned her back, defendant grabbed her from behind, putting her in a bear hug or "lock-hold."

While still holding the victim, defendant unlocked the sliding-glass back door and let Sanderlin in. Defendant and Sanderlin seized the victim's arms and put them behind her back, and defendant secured them with the tape he and Sanderlin had purchased earlier that evening. However, when defendant used the tape to gag the victim, she freed her hands and pulled the tape off. Defendant grabbed her again, put a towel around her mouth, and rebound her hands.

As defendant held the victim down, Sanderlin began pricking the victim in the side with a pocket knife, asking her, "Are you going to give me what I want?' " and "If you don't give me what I want, I will kill you." Sanderlin then began to rape the victim from behind. As defendant continued to restrain the victim, he noticed that the victim was turning blue and having difficulty breathing, so he removed the towel from her mouth. The rape lasted about five to eight minutes. After Sanderlin finished, stood, and pulled up his pants, the victim "flipped" defendant "off". Defendant "got mad" and "punched her in the face a couple of times," then "stomped her in the face like one or two times."

In the meantime, Sanderlin had gone to the kitchen and picked up a butcher knife. He slid that knife to defendant, then approached the victim from her blind side and started stabbing her in the neck "a

---

1. Details of Sasser's identity and relationship with the victim and defendant were developed during the pretrial hearing on defendant's suppression motion, as detailed later in this opinion, but were not provided to the jury.

couple of times" with his pocket knife. When that knife lodged in the victim's neck, she began rolling on the floor. Defendant used his sleeve to cover his hand as he picked up the butcher knife and "poked her like one or two times on her side." Defendant next stood over the victim and cut her across the throat, then handed the knife to Sanderlin, who "started working on her stomach." According to defendant, Sanderlin stabbed her to "the point that her intestines just fell out, it [sic] was just hanging out her stomach."

While Sanderlin was stabbing the victim, defendant "was already getting the wallet and stuff." Around this time, Sanderlin told defendant to "finish her" and left the apartment with the victim's keys to get her car. Defendant knelt and picked up the knife, again using his sleeve. The victim looked at him and said, "Please don't kill me," adding that she was about to die anyway. Defendant said, "I got to, Ma." She asked, "Can I please get some water?" but defendant told her, "No." The victim's "head tilt[ed] to the side a little bit, [and] her eyes done rolled back [in]to her head." Defendant walked out the back door of the apartment carrying the butcher knife.

Sanderlin drove defendant in the victim's car to Barringer Street, near defendant's Vann Street apartment. Defendant threw the knife into a street drain near the car, and then he and Sanderlin walked home. Defendant noticed blood on his clothes, so he took a shower. Defendant next removed between eighty and one hundred dollars from the victim's wallet, keeping twenty dollars while Sanderlin took the rest. Defendant put his bloody clothes in a bag and discarded them in a dumpster down the street and threw the victim's wallet into the woods behind his house. Finally, defendant drove the victim's car to a gas station to purchase cigarettes, then drove back to Barringer Street and, after using his shirt to wipe away any fingerprints on the car, walked home.

Defendant did not present evidence during the guilt-innocence portion of his trial, nor did he cross-examine six of the State's eleven witnesses. He did not dispute that his fingerprints were found at the victim's apartment and that blood was found on his shoes. He did not contest the manner and cause of the victim's death or the physical evidence that Sanderlin raped her. The jury found defendant guilty of first-degree murder based upon premeditation and deliberation and under the felony murder rule based upon the underlying offenses of robbery and rape.

At the subsequent sentencing proceeding, defendant presented sixteen witnesses. Manish Fozdar, M.D., an expert in neuropsychiatry, testified that defendant suffers from a disorder in the right hemisphere of the brain that affects his intellectual functioning, his ability to process information while under pressure, his ability to express his emotions and to read those of others, his behavior, his self-esteem, and his judgment. Dr. James Hilkey, an expert forensic psychologist, testified that defendant has a cognitive disorder and personality disorder with features of a schizotypal personality disorder and a dependent personality disorder. In addition, he diagnosed defendant with borderline intellectual functioning and added that defendant's understanding of the charges against him was simultaneously factual and irrational. Both experts testified that defendant was under a mental disturbance at the time of the crime and that his ability to conform his conduct to the requirements of the law was impaired. Various teachers, family members, and social workers testified that defendant struggled academically, had been slow to develop, and lacked structure and discipline in the home.

In rebuttal, the State presented Dr. Mark Hazelrigg, an expert forensic psychologist and Chief of Forensic Sciences at Dorothea Dix Hospital. Dr. Hazelrigg testified that defendant has borderline intellectual functioning but is not mentally retarded. Dr. Hazelrigg diagnosed defendant as having an antisocial personality disorder and saw evidence suggestive of malingering during some of the testing conducted in preparation for trial, although he did not diagnose malingering. He disagreed with defendant's experts' assessment that defendant has a mental or emotional condition that would interfere with his ability to understand wrongful acts or to conform his conduct to the requirements of the law.

The jury unanimously found the three submitted aggravating circumstances: that the murder was committed during the commission of a felony (rape), pursuant to N.C.G.S. § 15A-2000(e)(5); that the murder was committed for pecuniary gain, pursuant to N.C.G.S. § 15A-2000(e)(6); and that the murder was especially heinous, atrocious, or cruel, pursuant to N.C.G.S. § 15A-2000(e)(9). Of the eight statutory mitigating circumstances submitted, one or more jurors found four: that defendant acted under duress, pursuant to N.C.G.S. § 15A-2000(f)(5); that defendant acted under the domination of another person, also pursuant to N.C.G.S. § 15A-2000(f)(5); that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired,

pursuant to N.C.G.S. § 15A-2000(f)(6); and that defendant aided in the apprehension of another capital felon, pursuant to N.C.G.S. § 15A-2000(f)(8). Of fifty-nine submitted nonstatutory mitigating circumstances, and the catchall, § 15A-2000(f)(9), one or more jurors found two that had mitigating value: that defendant suffers from borderline intellectual functioning, and that defendant suffers from cognitive functioning impairments. The jury subsequently found the mitigating circumstances insufficient to outweigh the aggravating circumstances and concluded that the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty. Accordingly, the jury unanimously recommended a sentence of death and the trial court imposed a death sentence upon defendant on 9 July 2007. That same day, defendant entered Notice of Appeal to this Court pursuant to N.C.G.S. § 7A-27(a).

Additional facts will be set forth as necessary for the discussion of specific issues.

## PRETRIAL ISSUES

Defendant's first set of issues relates to his contention that the trial court erred in denying his pretrial motion to suppress his 9 November and 10 November 2005 statements to law enforcement officers, along with the physical evidence gathered as a result. Defendant argues that the statements were made while he was in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), but that he was given no *Miranda* warnings until after he had confessed to murder and been placed under arrest. In addition, because the State did not offer into evidence any statements defendant made before he was advised of his *Miranda* rights, defendant contends that, pursuant to *Missouri v. Seibert*, 542 U.S. 600, 159 L. Ed. 2d 643 (2004), any statements he made and any evidence obtained after the *Miranda* rights were administered were tainted by the prior illegally obtained confession and therefore were inadmissible. Further, defendant contends that officers did not honor his right to re-invoke his right to silence when he refused to give the correct name of the second suspect. Finally, defendant claims his attorneys provided ineffective assistance at the suppression hearing when they failed to present evidence that he was not mentally competent to waive his *Miranda* rights. The State responds that, except for his claim of ineffective assistance of counsel, defendant has not preserved these issues because he failed to object when this evidence was offered at trial.

**STATE v. WARING**

[364 N.C. 443 (2010)]

The trial court conducted a pretrial evidentiary hearing on defendant's motion to suppress his statements. The State presented evidence that, in the immediate aftermath of the murder, police questioned the victim's former roommate, Brad Sasser. Sasser had been seen at the victim's apartment with two black men and a white woman a few hours before the killing. When questioned, Sasser identified the two black men as "Joey" and "By," and the white woman as his girlfriend Ashley Hobgood. Sasser identified a photograph of defendant as "By" and police found defendant's fingerprint in the victim's apartment. Accordingly, investigators sought to interview defendant.

On the morning of Wednesday, 9 November 2005, Raleigh Police Officer Christopher Robb (Robb) was conducting surveillance of a house at 5120-A Vann Street while attempting to locate defendant. The officer was alone in an unmarked car parked near that address. At about 8:00 a.m., he observed defendant step out from the 5120-A Vann Street residence. Knowing that defendant was a person of interest as a possible suspect, Robb called his sergeant to inform him defendant was on the street. The sergeant instructed Robb to make contact with defendant.

Robb drove up to defendant and exited his car. The officer was in civilian clothes with his shirt untucked to conceal his weapon. He called out defendant's name and walked up to defendant, who was standing about twenty to thirty feet away. Robb identified himself as a police officer and told defendant he needed to talk with him. When defendant asked what he wanted to talk about, Robb replied that detectives were on the way to speak with defendant. Robb told defendant that he "was being detained" and that he "was not under arrest." Robb made no attempt to restrict defendant's movement and later testified that he would have allowed defendant to leave had defendant chosen to do so. Robb added that he was not familiar with all aspects of the case and tries to be a "soft hand" when he locates witnesses or suspects for investigators to avoid having an impact on the investigation.

When Robb asked defendant if he had any weapons on him, defendant responded that he had a knife in his pocket. Robb asked if he could retrieve the weapon and defendant voluntarily consented. Robb then asked defendant to have a seat on the curb until the detectives arrived, and defendant complied.

Less than ten minutes later, Raleigh Police Detectives Ken Copeland and Jacquie[2] Taylor arrived in an unmarked car and wearing civilian clothes. Defendant was sitting on the curb while Robb stood nearby, looking towards the 5120-A Vann Street residence. Detectives Taylor and Copeland intended to ask defendant to accompany them voluntarily to the Raleigh Police Department for an interview.

Detective Copeland approached Robb, who directed him to defendant. Detective Copeland introduced himself and Detective Taylor to defendant and shook defendant's hand. Detective Copeland told defendant he was not under arrest and not in trouble, then asked if he had a few minutes to talk. Defendant responded, "No problem." He added that the night before, Sasser had contacted him to report that police were looking for defendant and that he should "get out of town." According to defendant, he told Sasser he had "nothing to hide." However, when he asked Sasser for the detectives' telephone number, Sasser said he had lost it. Defendant told the officers he "was anxious to talk to the police and answer [their] questions because he had nothing to do with the girl getting hurt."

Detective Copeland asked defendant if he would come with them to the police department for an interview, and defendant voluntarily agreed. Detective Copeland received defendant's permission to pat him down for weapons before defendant entered the officers' car. With defendant in the front passenger seat and Detective Taylor in the back, Detective Copeland drove to the nearby police station, arriving at approximately 9:00 a.m. Defendant, who had not been handcuffed, walked freely into the building, unassisted by either detective. Detectives Copeland and Taylor escorted defendant through security and up to the Investigative Division on the fourth floor, where he was offered coffee.

Detective Copeland directed defendant to a well-illuminated interview room furnished with a table and a few chairs. The room was approximately eight feet on each side. Detective Copeland asked defendant to have a seat, then left to go to court on an unrelated matter, leaving defendant unattended in the interview room. Defendant was not handcuffed and no one guarded the door.

At approximately 9:15 a.m., Detective Taylor entered the room and began to interview defendant. She was wearing plain clothes

---

2. Spelled "Jackie" in some transcripts.

and unarmed. After taking down preliminary biographical information, Detective Taylor asked defendant about his relationship with the victim's roommate Brad Sasser and whether defendant knew the victim. Defendant responded that he had met Sasser, Sasser's girlfriend Ashley Hobgood, and the victim through a mutual friend, Matt Johnson, at a party thrown by Johnson two or three weeks previously. Since then, he had been hanging out with Sasser somewhat regularly.

Detective Taylor asked about defendant's activities on Monday, 7 November 2005, the day before the murder. Defendant responded that at about 10:00 p.m., he had gone with Sasser, Hobgood, and a person named "Dominic Copeland" to the victim's apartment to pick up some of Sasser's belongings. Defendant stated that he was at the apartment for about ten minutes. Once they left the apartment, Sasser took Dominic and defendant back to defendant's house on Vann Street, and Dominic caught a cab home. The following day, Matt Johnson told defendant the victim had been killed.

When Detective Taylor asked defendant whether he knew anyone named "Joey," defendant responded that he had a cousin by that name who lived in New York. The detective asked whether Joey had gone to the victim's apartment with them. Defendant replied that Joey had not gone there, but that Dominic had. Detective Taylor then asked if Sasser and the victim had been having any problems. Defendant responded that Sasser had been staying at the victim's apartment for about two weeks. However, the victim had become upset with Sasser for throwing a party at the apartment a few days earlier and told him he had to move out.

When Detective Taylor told defendant she knew the person he had been with was named "Joey" and not "Dominic," defendant stated that his cousin Joey from New York had been with them. Defendant said Joey knew Sasser from the party they had attended at Matt Johnson's house and that they had all been hanging out since the party. Defendant said Joey's full name was "Joey Jose" and that Joey had taken the train back to New York the previous morning. When Detective Taylor pointed out that she could check the train records for Joey's name, defendant suggested that perhaps Joey had gone to Durham to visit family.

Detective Taylor continued to focus her questions on Joey, defendant, and the period from Monday, 7 November to Tuesday, 8 November 2005. Defendant denied returning to the victim's apart-

ment after Sasser dropped him off at defendant's house. Defendant claimed he would not hurt anyone because that "is not what he does," adding that he "breaks into houses and cars."

Detective Taylor then informed defendant that footprint impressions had been observed at the victim's apartment and asked defendant if he would mind if they compared them with the shoes he was wearing. Defendant responded that he did not mind, then removed his shoes and handed them to Detective Taylor. She left the interview room with the shoes, closing but not locking the interview room door behind her, and gave them to her superior, Sergeant Clem Perry. No law enforcement officer stood guard or otherwise remained near the door.

While Detective Taylor was away from the interview room, she was informed that the victim's driver's license had been recovered from a storm drain in front of defendant's Vann Street residence. Detective Taylor and Sergeant Perry also noticed what appeared to be traces of blood on defendant's shoes.

At 10:35 a.m., Detective Taylor and Sergeant Perry returned to the interview room and informed defendant that the victim's driver's license had been recovered and that blood appeared to be on defendant's shoes. In response, defendant repeated the narrative he had previously given, adding that Sasser had "flipped out" at the victim's apartment when she told him to move out. The officers stopped defendant and reminded him that he had already given one statement and that he needed to be truthful. Sergeant Perry asked defendant if he was at the victim's apartment when she was hurt, and defendant nodded his head affirmatively. Defendant stated that after Sasser had dropped defendant off at his house, defendant called Sasser. Sasser asked defendant to return with him to the victim's apartment. Defendant declined to go with Sasser and instead walked to the victim's apartment. He arrived sometime between 11:55 p.m. and 12:30 a.m., after which Sasser and the victim began arguing. Defendant said that when he saw Sasser pick the victim off the couch and throw her on the floor, he went out the back door and sat down. He heard the victim scream, looked inside, and saw her running naked from Sasser. Defendant said he left and returned home. Defendant denied seeing Sasser kill the victim. After making this statement, defendant diagrammed the victim's apartment for Detective Taylor.

At this point they took another break. Detective Taylor asked defendant if he needed to go to the bathroom or if he wanted any-

thing to drink, but defendant declined. For approximately ten minutes, the investigators left defendant unattended in the interview room with the door closed but unlocked.

At 11:15 a.m., Detective Taylor returned to the interview room and began to confront defendant with some of the inconsistencies in his statements. Detective Taylor truthfully informed defendant that she had validated Sasser's alibi the previous evening and thus knew Sasser had not been at the victim's apartment when she was killed. Defendant responded that at times he did some work for Sasser and that Sasser had sent him to the victim's apartment because she owed Sasser sixty dollars. Defendant stated that after Sasser dropped him off, he walked back over to the victim's apartment and told her he was there to pick up some of Sasser's possessions. When the victim started to look for the items, defendant approached her and demanded the money. He and the victim argued briefly, began fighting, and fell wrestling to the floor. Defendant stated he hit the victim in the face and stomped her in the head before he "blanked out and ran out." Defendant held out his hand and showed Detective Taylor a fingernail that he said had been broken during the altercation.

Sergeant Perry then entered the interview room and informed defendant "that detectives had located his jacket over at the Vann Street address and that the jacket had blood on it." Defendant responded that the blood must have come from the victim's mouth and lip, which had been injured when he hit her in the face. Detective Taylor and Sergeant Perry left the interview room and requested that defendant's hands be photographed. Detective Taylor returned and again asked defendant if he needed to go to the bathroom or if he wanted something to eat or drink, and defendant again declined the offers. For about the next ten minutes defendant apparently was left alone in the interview room.

The investigators resumed their interview with defendant at approximately noon. They told defendant they knew he was not being completely honest and that "someone else was with him." They again asked about "Joey." Defendant was reluctant to identify Joey and eventually wrote the name "Joey Richardson" on Detective Taylor's notepad, along with a birthday and age. Defendant said he and Joey went to the victim's apartment together. While repeating the essence of his previous story, defendant now added that Joey stood outside while defendant went into the apartment to get the money and subsequently fought with the victim. Defendant stated that he and Joey left after the fight. Defendant then changed his story and said that he

left the apartment once the victim was on the floor. Then, according to defendant, Joey entered through the sliding-glass back door of the apartment as defendant was on his way out. Defendant denied being present when the victim was stabbed.

At around 12:40 p.m., they took another break. Detective Taylor left the interview room while defendant remained unattended with the door closed but not locked. No one stood watch at the door. Detective George Passley brought food to defendant sometime between 12:40 p.m. and 1:00 p.m., then left defendant alone for a short break with the door open. At around 1:00 p.m., Detective Passley walked by the interview room and, when defendant looked up at him, asked defendant if he wanted to talk. Defendant lowered his head and said, "Yes." Detective Passley asked defendant if he was going to tell the truth. Defendant looked up and repeated, "Yes." Detectives Passley and Taylor then discussed defendant's background with him briefly before returning to the subject of the victim's apartment. The detectives again encouraged defendant to tell the truth but did not advise him of his *Miranda* rights. Defendant was asked whether the sliding-glass back door of the victim's apartment had been locked. Defendant said that it was locked and that he had to release a latch and remove a security pole to open it. In response to a question from Detective Passley, defendant reported that the television's volume had been turned up.

When the investigators once more asked defendant whether he stabbed the victim, he answered again that he did not touch her after he beat her. He said he had put his clothes in a grocery bag and thrown them in a trash can near some brick apartments, describing the clothes and adding that he would show police where he had discarded them. Asked about the victim's wallet, defendant provided the new information that he had put it in his pocket. After later removing twenty dollars, he threw the wallet in some woods.

Because defendant's several statements had been inconsistent, the investigators continued to question him and again encouraged him to be truthful. In response, defendant made another statement in which for the first time he implicated himself in the murder. Defendant said he and Joey were sent by Sasser to obtain Sasser's money from the victim and to "get rid of her." They walked to the victim's apartment and, when she opened the door in response to defendant's knock, he told her Sasser had sent him to get a cord for his game system. Once inside, defendant opened the back door to admit Joey, who grabbed the victim and began to beat her. According

to defendant, Joey removed some of the victim's clothes and defendant held her while Joey raped her. After completing the rape, Joey picked up a knife from the kitchen and handed it to defendant. Defendant took the knife with his sleeve to avoid putting fingerprints on it. Joey said to defendant, "You know what you have to do." When the victim looked at defendant and said, "Please don't," defendant related that he "couldn't do it" and dropped the knife. Defendant told the investigators that Joey then grabbed the knife and stabbed the victim in the stomach until her intestines came out.

Detectives asked defendant clarifying questions about whether he had bound the victim with tape, whether he had stabbed her, and the current location of the knife and the victim's car. Defendant acknowledged that he and Joey bound and gagged the victim with the tape they had purchased that day and brought with them, then admitted that he stabbed the victim once on her throat, once on the chest, and once in the stomach.

While giving this statement defendant became upset, said he did not mean to hurt her, then dropped his head and began to cry. He said that Joey left in the car and took the twenty dollars defendant gave him from the victim's wallet. When investigators again asked defendant whether Sasser had sent Joey and him to the victim's apartment, defendant now said Sasser had not sent them but that earlier in the day Sasser had told defendant he needed his money. Finally, defendant was asked if he knew where Joey could be found, and defendant responded that he did not know.

At this point, between 2:00 p.m. and 2:15 p.m., Detectives Taylor and Passley left the interview room and closed the door. When the detectives returned to the interview room at approximately 2:20 p.m., they advised defendant that he was under arrest and, at 2:26 p.m., gave him his *Miranda* rights both orally and in writing. They reviewed the written form with defendant in its entirety, and defendant acknowledged each right by marking "yes" and initialing the form beside each listed right. This form was entered into evidence during the suppression hearing.

The detectives then showed defendant a picture of Joseph Sanderlin, an African-American male, but defendant denied that the person depicted was Joey. Detective Passley asked defendant if he would be willing to show where he had thrown the wallet and the clothing he had discarded, and defendant agreed. Detective Passley and Officer B.A. Lindsey left the police station at 3:05 p.m. with

defendant to locate various pieces of evidence. Defendant, who was handcuffed and wearing leg irons, was placed in the rear of the car beside Detective Passley. Officer Lindsey drove while defendant gave directions. Defendant told Detective Passley what he had been wearing and where he discarded those clothes. The officers recovered defendant's baseball cap from one of the dumpsters he identified. Defendant also showed where he had thrown the victim's purse, which the police recovered.

At 4:20 p.m., defendant asked if he could say good-bye to his girlfriend. In response, Detective Passley allowed defendant to talk with his girlfriend as she stood at the vehicle door while defendant remained in the back seat. The two spoke briefly in an encounter that was "a little emotional." Afterwards, defendant requested to use the bathroom and was taken to a police district station house for that purpose. Detective Passley then asked defendant if he wanted food. Defendant declined, but asked for something to drink, so Officer Lindsey drove to a nearby McDonald's, where Detective Passley bought him a soft drink.

Officer Lindsey began driving towards Apex to look for the victim's car. As he drove, Officer Lindsey remarked that "[i]t sure would be nice to drive up at the house in Apex and see that car in the driveway." Detective Passley then said to defendant, "You know where the car is located. I know you know." Defendant responded, "Make a right," and directed Officer Lindsey to Barringer Drive, where, at 5:05 p.m., they located the victim's vehicle.

While waiting for evidence technicians to arrive and process the vehicle, Detective Passley asked defendant what he had done with the knife. After defendant answered that he had thrown it in a storm drain nearby, Detective Passley was able to recover it. A substance that appeared to be blood was on the knife blade.

Once the evidence technicians arrived, Officer Lindsey again began driving towards Apex to locate the second suspect, whom defendant was now identifying as "Tony Martinez," a cousin from New York. Defendant claimed that this person was with him on the night of the murder. However, defendant could not provide any specific information about Tony Martinez, and once they arrived in Apex, defendant admitted no suspect was there. When asked why he had given false information after being truthful about the car and the knife, defendant said that he "just had to." Detective Passley told defendant he would have to disclose the real name of the sec-

STATE v. WARING

[364 N.C. 443 (2010)]

ond suspect, but defendant said he "was not going to snitch on anyone" and that Detective Passley "would not understand." Detective Passley told defendant he should not be the only one charged with the death.

At about 6:15 p.m., they arrived back at the Raleigh Police Department. Defendant was returned to the interview room, where his handcuffs and leg restraints were removed. Defendant declined Detective Passley's offer of food or drink. When Detective Passley said he would be back to talk about the second suspect, defendant responded, "Okay."

About 6:30 p.m., Detective Passley returned to the interview room to discuss the second suspect. He asked defendant to make another statement to "firm up" some things he had said while on the way to recover the purse and the clothing, and defendant agreed. Defendant then made a statement substantially consistent with his earlier confession to Detective Taylor. In this statement defendant did not mention "Joey," but continued to implicate "Tony" as the second suspect. Detective Passley told defendant that no one named Tony was involved in the case, that he knew it was Joey Sanderlin, and that defendant should tell the truth. Finally, defendant responded: "It was Joey. He cut her first. He cut her the most. I only cut her, like, three or four times." Detective Passley asked if Sandlerlin had raped the victim and defendant responded, "Yeah." Defendant, however, denied having sex with the victim and claimed he only held her down. Defendant stated that he only went to the victim's apartment "to get the green." When Detective Passley asked defendant why he stabbed the victim, he responded that he did not know and "[i]t all happened so fast, and it all got out of hand."

Detective Passley then asked if anyone else was with defendant and the second suspect, and defendant responded, "No." At this point, sometime before 8:20 p.m., Detective Passley concluded the interview and left the room. At 8:20 p.m., Detective Passley returned with one of the shoes defendant had been wearing when the police picked him up. Defendant stated that he used soap and water to wash his shoes at Vann Street, but he did not know where Joey had cleaned up.

No further questions were asked of defendant on 9 November, and defendant was taken by a uniformed officer to the magistrate's office for an initial appearance. He was admitted into the Wake County Jail at 11:26 p.m.

The next morning, 10 November, Detectives Passley and Montague retrieved defendant from the Wake County Jail and returned him to the same interview room at the Raleigh Police Department. At 10:48 a.m., Detectives Copeland and Passley re-advised defendant of his *Miranda* rights both verbally and in writing, again using a standard form. Detective Passley reviewed the form aloud to make sure defendant understood his rights and recorded defendant's answers to each right by marking "yes" on the form beside the appropriate listing. Defendant added his initials beside each right. Defendant stated that he was willing to speak to detectives without an attorney and signed the waiver of rights form. This second form was also introduced into evidence as an exhibit at the suppression hearing.

Detective Passley asked defendant about Sunday, 6 November 2005, and defendant provided a statement detailing the prelude to the murder, the murder itself, and the events following the murder. Defendant concluded this statement, which was written down by Detective Copeland, at 12:26 p.m. Detectives Passley and Copeland left the interview room, closing and locking the door behind them.

When the detectives returned, defendant consented to a tape-recorded interview. His recorded confession, which was consistent with his final verbal statement, began at 12:45 p.m. and ended at 1:01 p.m. During his audiotaped confession, defendant stated his accomplice was a cousin named Joey Santiago.

Based on the evidence presented at this suppression hearing, the trial court entered a written order that recited one hundred and seven findings of fact. Among these findings were that defendant was first placed in custody on 9 November 2005 when, after he admitted in the course of the 1:00 p.m. interview with Detectives Passley and Taylor that he had stabbed the victim, the investigators locked him in the investigation room; that defendant had been polite and cooperative; and that defendant had not refused to answer any questions, did not ask for the interview to terminate, and did not ask to consult an attorney.

As to defendant's 9 November 2005 statement, the trial court found that defendant was coherent, did not appear to be under the influence of any impairing substance, and seemed to be of at least average intelligence; that no law enforcement officer raised his voice while questioning defendant; that defendant was not threatened nor was any promise of reward made to him during the interviews; that

defendant was never misled, deceived, or confronted with false accusations or false evidence; that defendant never requested an attorney, never asked to make a telephone call, and never requested to stop answering questions; that the investigators regularly inquired about defendant's comfort; that defendant never appeared scared or intimidated during the interviews; and that at the time of defendant's statements, he was familiar with the criminal justice system. The trial court further found no evidence that defendant was impaired or unable fully to understand his rights or his situation. As to defendant's 10 November 2005 audiotaped statement, the trial court further found as fact that defendant was not subject to coercion, that the tone was conversational, that defendant had not been threatened and no rewards or inducements were promised him, and that defendant's statements were voluntary.

Based upon these and other extensive findings of fact, the trial court concluded as a matter of law that at the time Detective Taylor, both individually and with Detective Passley, interviewed defendant at the Raleigh Police Department before 2:20 p.m. on 9 November 2005, defendant was not under arrest or otherwise restricted in his movement to the degree associated with a formal arrest. The trial court further concluded that a reasonable person in defendant's position would not have believed he was in custody or under formal arrest while being interviewed by Detective Taylor and Detective Passley. Therefore, because statements made by defendant before administration of his *Miranda* rights were given voluntarily, and because there had been no misconduct or abuse by investigators, none of defendant's state or federal constitutional rights had been violated by the noncustodial interviews. In addition, the trial court concluded that defendant was in custody when he was interviewed after 2:20 p.m. on 9 November 2005 and again on 10 November 2005, and on both occasions, defendant was advised of his *Miranda* rights and voluntarily and knowingly waived those rights. Accordingly, the trial court denied defendant's motion to suppress his statements.

[1] Defendant argues that the trial court made numerous errors in its order. Generally, an appellate court's review of a trial court's order on a motion to suppress is limited to a determination of whether its findings are supported by competent evidence and, in turn, whether the findings support the trial court's ultimate conclusions of law. *E.g.,* *State v. Cooke,* 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). However, here, as noted above, the State argues that defendant failed to preserve the issue because he did not object at trial. Defendant coun-

ters that no objection was necessary, distinguishing our recent opinion in *State v. Oglesby*, 361 N.C. 550, 554, 648 S.E.2d 819, 821 (2007) (holding that "a trial court's evidentiary ruling on a pretrial motion is *not* sufficient to preserve the issue . . . for appeal unless a defendant renews the objection during trial"). Defendant's contention is that the judge who heard and denied the motion to suppress specifically ruled that "[s]uch statements may be received into evidence in the trial of this action." As a result, defendant argues, the judge who presided over defendant's trial was bound by the hearing judge's ruling on the suppression motion and no renewed objection at trial was necessary.

A pretrial ruling on a motion to suppress evidence is preliminary. *State v. Hill*, 347 N.C. 275, 293, 493 S.E.2d 264, 274 (1997), *cert. denied*, 523 U.S. 1142, 140 L. Ed. 2d 1099 (1998). Because the evidence may be different when offered at trial, a party has the responsibility of making a contemporaneous objection. *Id.* This rule sensibly acknowledges the realities of trial practice and we see no reason to change it now. Thus, *Oglesby* controls here. Therefore, to the extent defendant failed to preserve issues relating to the motion to suppress, we review for plain error. We begin by addressing defendant's challenges to the trial court's findings of fact.

[2] Defendant contests the trial court's findings that Officer Robb, who made the first police contact with defendant outside his residence the morning of 9 November 2005, "would have allowed the Defendant to walk away if the Defendant had chosen to leave," and that Robb "was not privy to the details of an investigation." Defendant claims these findings of fact were not supported by the evidence. At the hearing, Robb described his position with the Fugitive Task Force (FTF) of the Raleigh Police Department, where his duties included assisting the Major Crimes Task Force in locating subjects, giving those subjects a general idea what is going on, and, if no arrest warrant had been issued, asking if they would be willing to speak with detectives. Robb testified that without a warrant for defendant's arrest, he would not have had the authority to stop defendant had he chosen to leave. In addition, Robb stated that it is not the responsibility of the FTF to investigate crimes and FTF members are not privy to every aspect of an investigation. Here, he knew only such basic information as that "there had been a murder and that a female had been stabbed" and that defendant "was a person of interest in the case." After reviewing the record, we conclude that the trial court's findings as to Robb's encounter with defendant are fully supported by competent evidence.

**[3]** Defendant next argues the trial court incorrectly found that defendant "voluntarily" agreed to accompany detectives to the Raleigh Police Department. Although defendant phrases this argument in terms of whether a reasonable person would have believed he had any choice in accompanying the officers, the reasonable person standard is properly used in determining whether one is in custody, an issue we address below. *See State v. Garcia*, 358 N.C. 382, 396-97, 597 S.E.2d 724, 736-37 (2004), *cert. denied*, 543 U.S. 1156, 161 L. Ed. 2d 122 (2005). For now, we consider the trial court's finding that defendant acted voluntarily. The investigators testified that when they arrived at defendant's Vann Street location, they introduced themselves, shook hands, and told him he was not under arrest and was not in trouble. Detective Copeland told defendant they would like to talk with him and asked defendant if he would mind taking a ride downtown. Defendant replied he "wanted to come down" and added that he had asked Brad Sasser for the detectives' phone number the night before and was eager to answer their questions "because he had nothing to do with the girl getting hurt." This evidence from the hearing supported the trial court's finding of fact that defendant "voluntarily agreed" to accompany detectives to the police station.

**[4]** Finally, defendant contests the trial court's finding of fact that no guard was at the door of the interrogation room at various points during defendant's questioning. Defendant points to statements made by Detective Copeland on cross-examination that Raleigh Police Department protocol called for having an officer by the door when someone was in the interrogation room, and a person in the room was not permitted to leave without an escort. However, Detective Taylor testified at the suppression hearing that when defendant was left alone in the room, no one was standing guard. In addition, Detective Taylor testified that "after the confession, [defendant] was much more confined" in that "now he's being watched by somebody, being locked in the room when people are leaving. Before that, he had free movement." While the protocol described by Detective Copeland may not have been followed here, Detective Taylor's testimony about specific aspects of defendant's questioning was not contradicted. "[A] trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (citations and internal quotations marks omitted). The trial court's resolution of conflicting evidence will not be disturbed on appeal. *State v. Braxton*, 344 N.C. 702, 709, 477 S.E.2d 172, 176 (1996) (cita-

tion omitted). Because competent evidence supported the trial court's findings that no one guarded the door during the initial interviews of defendant, these findings are binding on appeal.

[5] We now turn to the trial court's conclusions of law. Defendant contends that the trial court erred when it concluded as a matter of law that he was not in custody for *Miranda* purposes prior to his admission that he stabbed the victim. Whether an individual is in custody for purposes of *Miranda* is a mixed question of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 110-13, 133 L. Ed. 2d 383, 393-94 (1995). Accordingly, we review the trial court's pertinent findings of fact to determine whether they are supported by competent evidence from the record, and we review whether its conclusions of law are proper and "reflect[] a correct application of [law] to the facts found." *State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997).

"[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977) (per curiam). "The proper inquiry for determining whether a person is 'in custody' for purposes of *Miranda* is 'based on the totality of the circumstances, whether there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." ' " *State v. Barden*, 356 N.C. 316, 337, 572 S.E.2d 108, 123 (2002) (quoting *Buchanan*, 353 N.C. at 339, 543 S.E.2d at 828 (citations omitted)), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 128 L. Ed. 2d 293, 298 (1994) (per curiam). "We must therefore determine whether, based upon the trial court's findings of fact, a reasonable person in defendant's position would have believed that he was under arrest or was restrained in his movement to that significant degree." *Garcia*, 358 N.C. at 396-97, 597 S.E.2d at 736-37 (citation omitted).

Defendant argues that a reasonable person who was detained for questioning, transported to the secure floor in the police department while having no ability to communicate with anyone outside the station, unable to return to his residence, and deprived of his shoes after 10:30 a.m., would have believed he was constrained "to a degree com-

mensurate with arrest." Because "no single factor is necessarily controlling" when we consider whether an individual is in custody for *Miranda* purposes, *see Barden*, 356 N.C. at 338, 572 S.E.2d at 123-24, we must examine the totality of the circumstances surrounding defendant's interrogation, *Garcia*, 358 N.C. at 396, 597 S.E.2d at 736. This Court has considered such factors as whether a suspect is told he or she is free to leave, *State v. Kemmerlin*, 356 N.C. 446, 457, 573 S.E.2d 870, 880 (2002), whether the suspect is handcuffed, *State v. Greene*, 332 N.C. 565, 577-78, 422 S.E.2d 730, 737 (1992), whether the suspect is in the presence of uniformed officers, *Garcia*, 358 N.C. at 397, 597 S.E.2d at 737, and the nature of any security around the suspect, *State v. Jackson*, 348 N.C. 52, 56, 497 S.E.2d 409, 411, *cert. denied*, 525 U.S. 943, 142 L. Ed. 2d 301 (1998).

Defendant is an adult male with prior experience with the state's criminal justice system. *See Garcia*, 358 N.C. at 397, 597 S.E.2d at 737. When first approached by Officer Robb, defendant was told he was being detained until detectives arrived but that he was not under arrest. When he was again advised by the detectives upon their arrival that he was not under arrest, defendant voluntarily agreed to accompany them to the police station, affirmatively telling them he was "anxious" to talk with them and answer their questions. Defendant was never restrained from the time of his initial encounter with Detectives Copeland and Taylor until the door of the investigation room was locked after defendant admitted stabbing the victim. Until then, defendant was frequently left alone in the interview room with the door unlocked and no guard posted. Throughout the interview he was given several bathroom breaks and was offered food and drink. Defendant was cooperative and allowed investigators to examine his shoes. Although detectives encouraged defendant to tell the truth, they did not raise their voices and they neither threatened defendant nor wheedled statements from him with promises. Defendant was never misled, deceived, or confronted with false evidence. Once defendant implicated himself by acknowledging his direct participation in the killing, the interview ended and defendant was given his *Miranda* rights. Under these circumstances, we agree with the trial court that defendant was not formally arrested or otherwise subjected to the restraint on his freedom of movement associated with a formal arrest.

Defendant correctly points out he was told by Officer Robb that he was "detained" while he waited on the curb for the detectives to arrive. However, any custody associated with the detention ended

STATE v. WARING

[364 N.C. 443 (2010)]

when defendant left Robb and voluntarily accompanied Detectives Copeland and Taylor. Robb also told defendant more than once that he was not under arrest, a status investigators confirmed when they arrived, and any conflict engendered in defendant's mind by being told at the outset that he was being detained pending the investigators' arrival necessarily dissipated when those investigators appeared and specifically told defendant he was not under arrest. *See State v. Gaines*, 345 N.C. 647, 658-63, 483 S.E.2d 396, 402-06 (holding that the juvenile defendants who voluntarily left their homes in the middle of night to ride to the police department in patrol cars and who were told they were not under arrest were not in custody), *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997); *State v. Lane*, 334 N.C. 148, 154, 431 S.E.2d 7, 10 (1993) (holding that a defendant who was told several times he was not under arrest and who never asked to leave during an interview with investigators was not in custody); *State v. Phipps*, 331 N.C. 427, 443-45, 418 S.E.2d 178, 185-87 (1992) (holding that a defendant who voluntarily rode to the station with officers in a police car, waited in a lobby with unlocked external doors, and was told more than once he was not under arrest, was not in custody).

Although defendant focuses on his inability to leave the interview room without supervision or escort, we believe it unlikely that any civilian would be allowed to stray through a police station. Defendant was in an area not open to the public, and the prevention of unsupervised roaming in such a space is hardly the type of restriction that a reasonable person would associate with a formal arrest. *See State v. Medlin*, 333 N.C. 280, 290-92, 426 S.E.2d 402, 407-08 (1993) (holding that the defendant, who was constantly in the presence of officers and escorted to the rest room, was not in custody and "[i]t is also unlikely that anyone would have been permitted to wander unmonitored around police headquarters").

Thus, under the totality of the circumstances, we do not find that "a reasonable person in defendant's position would have believed that he was under arrest or was restrained in his movement to that significant degree." *Garcia*, 358 N.C. at 396-97, 597 S.E.2d at 737. As a result, defendant was not in custody when he arrived at the Raleigh Police Station on the morning of 9 November 2005, nor was he placed in custody upon entering the interview room or during the interviews prior to his acknowledgment that he stabbed the victim. Because these statements were voluntary and would have been admissible if offered into evidence, no issue arises under *Missouri v. Seibert*. 542

U.S. 600 *passim*, 159 L. Ed. 2d 643 *passim* (holding that a statement given after *Miranda* warnings have been administered may be inadmissible when police have elicited a previous unwarned statement during a custodial interrogation). Accordingly, the statements made after defendant was taken into custody and advised of his rights under *Miranda*, including his tape-recorded confession, as well as any physical evidence derived therefrom, were properly admitted into evidence.

**[6]** Defendant next contends that his invocation of his right to silence was not scrupulously honored while he was with Detective Passley and Officer Lindsey. The three were together in a police car for approximately three hours while defendant assisted the officers in recovering evidence. The investigators told defendant they did not believe the other participant in the killing was "Tony Martinez," as defendant claimed, and urged him to provide the correct name. Defendant responded that he "was not going to snitch on anyone" and declined to reveal the name of the other person involved. Defendant argues that giving investigators notice of his scruples against snitching invoked his right to silence and that all interrogation should have ceased.

"[A] criminal defendant who has been advised of and has waived his rights has the right to terminate a custodial interrogation by indicating 'in any manner, [and] at any time prior to or during questioning, that he wishes to remain silent.' " *State v. Murphy*, 342 N.C. 813, 823, 467 S.E.2d 428, 433-34 (1996) (quoting *Miranda*, 384 U.S. at 473-74, 16 L. Ed. 2d at 723 (alteration in original)). However, "[a]lthough custodial interrogation must cease when a suspect unequivocally invokes his right to silence, an ambiguous invocation does not require police to cease interrogation immediately." *State v. Forte*, 360 N.C. 427, 438, 629 S.E.2d 137, 145, *cert. denied*, 549 U.S. 1021, 166 L. Ed. 2d 413 (2006). Defendant's statement that he "was not going to snitch" when asked the correct name of an accomplice is not a clear invocation of his right to silence. At most, his response was ambiguous and did not require officers to cease their questioning or seek clarification. *See Davis v. United States*, 512 U.S. 452, 459, 129 L. Ed. 2d 362, 371-72 (1994) (holding that a suspect must unambiguously request counsel).

**[7]** Finally, defendant contends that he was deprived of his constitutional right to effective assistance of counsel as the result of his lawyers' failure to present evidence at the suppression hearing of defendant's limited intellectual functioning. Although defense coun-

sel did not raise any issue concerning defendant's intellectual functioning at the hearing, no evidence indicated that defendant was confused or incapable of understanding either the detectives or his rights. In contrast, the evidence indicates he was coherent, gave cogent answers that were responsive to the questions asked, and made his statements knowingly, freely, and voluntarily. Moreover, the record plainly reveals that defense counsel was aware of evidence of defendant's mental condition, suggesting that failure to pursue the issue during the pretrial suppression hearing may have been a strategic decision. *See State v. Frogge*, 359 N.C. 228, 245, 607 S.E.2d 627, 637 (2005) (holding that defense counsels' decision to abandon a defense based upon brain dysfunction and pursue a different approach was a "reasonable professional judgment" (citations and internal quotation marks omitted)). Nevertheless, because the record is silent as to why this issue was not raised at the suppression hearing, we dismiss this assignment of error without prejudice to defendant's right to reassert it in a post-conviction motion for appropriate relief. *See State v. Fair*, 354 N.C. 131, 167, 557 S.E.2d 500, 525 (2001), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002).

## JURY SELECTION ISSUES

[8] We next turn to issues pertaining to selection of the jury. In his first related argument, defendant contends that the State improperly used peremptory challenges to strike prospective African-American jurors Glenda Rogers and Francine Johnson on the basis of race.

Our review of race-based or gender-based discrimination during petit jury selection has been the same under both the Fourteenth Amendment to the United States Constitution and Article 1, Section 26 of the North Carolina Constitution. *State v. Maness*, 363 N.C. 261, 271-72, 677 S.E.2d 796, 803 (2009) (citations omitted), *cert. denied*, —— U.S. ——, 176 L. Ed. 2d 568 (2010). The Supreme Court of the United States has held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83 (1986). A defendant's claim that a peremptory challenge is improperly based upon race triggers a three-step inquiry. First, the party raising the claim must make a prima facie showing of intentional discrimination under the "totality of the relevant facts" in the case. *Id.* at 94, 90 L. Ed. 2d at 86. Second, if a prima facie case is established, the burden shifts to the State to present a race-neutral explanation for the

challenge. *Rice v. Collins*, 546 U.S. at 333, 163 L. Ed. 2d at 831. Finally, the trial court must then determine whether the defendant has met the burden of proving "purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 239, 162 L. Ed. 2d 196, 213 (2005). The trial court's ruling will be sustained "unless it is clearly erroneous." *Snyder v. Louisiana*, 552 U.S. 472, 477, 170 L. Ed. 2d 175, 181 (2008) (citations omitted).

In *Miller-El* the Supreme Court confirmed that this process is not a formality:

A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

545 U.S. at 252, 162 L. Ed. 2d at 221. Thus, "in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder*, 552 U.S. at 478, 170 L. Ed. 2d at 181. Accordingly, this Court has been sensitive to *Batson's* requirements. *See, e.g., Barden*, 356 N.C. at 342-45, 572 S.E.2d at 126-28; *State v. Hoffman*, 348 N.C. 548, 553-56, 500 S.E.2d. 718, 722-23 (1998).

Defendant first contends that a *Batson* violation occurred when the prosecutor exercised a peremptory challenge against Glenda Rogers, an African-American female. Rogers was the seventeenth prospective juror and the fourth African-American examined on voir dire. The first three African-Americans were successfully challenged for cause by the State on the basis of their opposition to the death penalty. At the time Ms. Rogers was examined, four white jurors had been accepted by the State and seated on the jury.

The first question the prosecutor asked each prospective juror during voir dire was whether he or she opposed the death penalty. When that question was posed to Ms. Rogers, she initially expressed unequivocal opposition:

Prosecutor: . . . [L]et me start with your personal views about the death penalty. Are you opposed to the death penalty?

Ms. Rogers: I am.

Prosecutor: You are. Are—are your —is your opposition to the death penalty a strong personal belief?

Ms. Rogers: The fact that I believe people are going to be punished for what they do. And it's because the death penalty, I don't believe in that.

However, as voir dire proceeded, Ms. Rogers's apparent conviction wavered. When asked whether, knowing no details of the case, she would be predisposed to vote for life imprisonment without parole rather than death, Ms. Rogers responded, "No, I don't think I would be predisposed." The prosecutor then asked if she could vote for the death penalty in any case on which she might be required to sit, and she answered, "I don't know." The prosecutor next explained to her the juror's role in a capital sentencing proceeding and asked if she could personally vote to sentence someone to death. Ms. Rogers responded, "I don't think so." However, when the prosecutor rephrased the question, Ms. Rogers answered: "If—if I'm picked, and I'm sitting on the jury, and all the evidence and everything following the law, I could. I could. . . . I mean, I could vote for the death penalty." Ms. Rogers acknowledged that her responses had been inconsistent and, when the prosecutor probed further, stated: "Personally if I—if you asked me, and I'm not sitting on the case, no, I wouldn't go with the death penalty. . . . But if I'm here, and I'm hearing the case and understanding the laws, I feel like I could do it."

The prosecutor turned to other subjects, and Ms. Rogers answered routine questions about her employment and personal life. She stated that she was single, worked at the State Employees' Credit Union as a debit card specialist, and was her church's videographer. When the prosecutor asked Ms. Rogers whether she read the local newspaper, she responded that she did not, but watched the local news on television. The prosecutor then referred to her jury questionnaire and asked Ms. Rogers if she had not checked "No" when asked whether she watched television regularly. Ms. Rogers confirmed her response to the questionnaire, clarifying that "[o]nly when I have time, I might turn [the television] on." Questioned further, she explained that she actually watched the local news "just about" every night, adding that "[u]sually at night I turn it on when I'm getting ready to go to bed."

During additional questioning by the prosecutor, Ms. Rogers revealed that one of her brothers had been a murder victim in New York approximately twenty years earlier. She had left blank the question on her jury questionnaire that asked if any family member or close friend had been a victim of a crime.

Before concluding his voir dire, the prosecutor returned to the death penalty, asking what her views were now that she had been directly questioned on the issue. She responded that she had thought about it and elaborated, "Well, when you first said to me, do you believe in the death penalty . . . [,] I said no. But you know, given the laws and the penalties that goes with the laws, I feel like I could." The State then exercised its first peremptory challenge to strike Ms. Rogers, and defendant raised a *Batson* objection. Defendant acknowledged that this was the State's first peremptory challenge, but pointed out that Ms. Rogers is an African-American woman and argued that the language she used regarding the death penalty was "consistent with language that the prosecutor [had] passed for accepting jurors on that were not black or of African-American persuasion." Defendant referred to jurors Metz, a white male, and Skiff, a white female. According to defendant, both of these jurors had expressed similar positions on the death penalty during voir dire, but had not been challenged by the State and were seated on the jury. The only difference here, defendant contended, appeared to be Ms. Rogers's race. In addition, defendant argued that all four jurors seated at this point were white and Ms. Rogers had "clearly expressed that she could follow the law, and if appropriate, recommend a death punishment."

The trial court determined that defendant failed to make a prima facie showing of racial discrimination and overruled his *Batson* objection:

I don't think that the defense has made a prima facie showing requiring the second or third steps of the three-part Batson analysis, and I am going to deny your request, in my discretion. I think that you have failed to show that the State has exercised a peremptory—a peremptory challenge that was motivated by improper—they were not removing based solely on the fact that she was an African-American female.

Defendant objected, and the court allowed the prosecutor to proffer race-neutral reasons for the strike. The State noted that Detectives Passley and Montague, lead investigators in the murder and witnesses at the guilt portion of the trial, are both African-American. The prosecutor then addressed Ms. Rogers's views on the death penalty:

Judge, Ms. Rogers said that she was opposed to the death penalty, and that she believed people were going to be punished

STATE v. WARING

[364 N.C. 443 (2010)]

by God, ultimately, but she was personally opposed to the death penalty. I have not passed anyone that has said that they were personally opposed to the death penalty.

The State is looking for jurors that are not personally opposed to the death penalty. But then, also, Ms. Rogers, who has been thinking about this since last Tuesday, and after I inquire, she's equivocal about this. Not enough for the State to make a challenge for cause, but her initial answers to me, this is her first time to come down to this court and talk about it is she doesn't think she can do it, no, I can't do it, then she could do it. Okay.

Those are—those are reasons why I'm not comfortable with Ms. Rogers, who is opposed to the death penalty, unlike Mr. Metz—and I'm not going to go back and piecemeal every juror I have—I have passed or not. But I have not passed anyone that is personally opposed to the death penalty, and will continue to look for people that are not personally opposed to the death penalty.

The prosecutor also noted the inconsistencies between Ms. Rogers's answers on her jury questionnaire and her voir dire testimony regarding whether any of her family members had been a crime victim, as well as details of her television viewing habits. The prosecutor concluded:

I didn't get a good sense that Ms. Rogers had a good sense of herself, of whether she could participate in this process. And she was opposed to the death penalty, gave extremely equivocal responses, and her last ones were that she could participate.

This Court has noted that "a *prima facie* showing of racial discrimination[] is not intended to be a high hurdle for defendants to cross. Rather, the showing need only be sufficient to shift the burden to the State to articulate race-neutral reasons for its peremptory challenge." *Hoffman*, 348 N.C. at 553, 500 S.E.2d at 722. We have identified several relevant factors that may be considered in determining whether a defendant has met his or her burden, including:

the defendant's race, the victim's race, the race of the key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, repeated use of peremptory challenges against blacks such that it tends to establish a pattern of strikes against blacks in the venire, the prosecu-

tion's use of a disproportionate number of peremptory challenges to strike black jurors in a single case, and the State's acceptance rate of potential black jurors.

*State v. Quick,* 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995) (citation omitted). Although the State proffered reasons to support its exercise of a peremptory challenge against Ms. Rogers, the trial court did not rule on these reasons. Instead, the trial court, in its discretion, effectively denied defendant's *Batson* challenge by allowing the State's peremptory challenge. Therefore, " '[w]here the trial court rules that a defendant has failed to make a *prima facie* showing, our review is limited to whether the trial court erred in finding that defendant failed to make a *prima facie* showing, even if the State offers reasons for its exercise of the peremptory challenges.' " *Barden,* 356 N.C. at 343, 572 S.E.2d at 127 (quoting *State v. Smith,* 351 N.C. 251, 262, 524 S.E.2d 28, 37, *cert. denied,* 531 U.S. 862, 148 L. Ed. 2d 100 (2000)).

In raising his *Batson* challenge, defendant argued that Ms. Rogers's language regarding the death penalty was "consistent with language that the prosecutor has passed for accepting jurors on that were not black or of African-American persuasion," specifically referring to jurors Metz and Skiff, both of whom during voir dire had "expressed various opinions about the death penalty and various concerns about their level of comfortability with it." Defendant noted that juror Metz had voiced some personal issues with the death penalty but ultimately stated he could follow the law. Defendant argued that juror Metz's position was "essentially the same position that Ms. Rogers has taken, the difference between the two appearing to be race." In addition, defendant pointed out that juror Skiff had indicated that she was "predisposed to life without parole" and that "the death penalty would not be [her] 'plan A.' "

Because Ms. Rogers was the first prospective juror peremptorily challenged by the State, no pattern of disproportionate use of peremptory challenges against African-Americans had been established. However, "the Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder,* 552 U.S. at 478, 170 L. Ed. 2d at 181 (citation and quotation marks omitted); *State v. Robbins,* 319 N.C. 465, 491, 356 S.E.2d 279, 295 ("Even a single act of invidious discrimination may form the basis for an equal protection violation."), *cert. denied,* 484 U.S. 918, 98 L. Ed. 2d 226 (1987). Therefore, we consider other relevant facts to determine if defendant established a prima facie case of racial discrimination.

We note that while prospective jurors Metz, Skiff, and Rogers all indicated they could follow the law and vote to impose capital punishment, Ms. Rogers is the only one of the three who stated when first asked that she was personally opposed to the death penalty. By contrast, when the prosecutor initially asked prospective juror Skiff, "Are you opposed to the death penalty?," her answer was "I—no." Similarly, when the prosecutor asked prospective juror Metz at the outset of his voir dire, "Are you opposed to the death penalty?," his answer was "No." Consequently, a definable difference was apparent in the personal views on the death penalty as expressed by prospective juror Rogers on one hand and prospective jurors Skiff and Metz on the other. Balanced against this difference are the factors that this case involved an African-American defendant and a white victim; all three African-American prospective jurors previously examined had been excused for cause on grounds that they opposed the death penalty; and four white jurors had been seated. In light of the responses of the prospective jurors to the key voir dire questions about their views on the death penalty, and considering the absence of any pattern of discrimination in the exercise of the State's peremptory challenges at the time the prosecutor peremptorily challenged prospective juror Rogers, we conclude that defendant failed to meet his burden of establishing a prima facie case that the State's action was motivated by race. Accordingly, the trial court did not err in denying this *Batson* challenge.

Our inquiry as to this challenge does not end here, however. Defendant also contends the trial court applied the wrong standard when it stated that defendant failed to show that the State's challenge was "based *solely* on the fact that she was an African-American female." (Emphasis added.) As stated in *Miller-El*, the third step in a *Batson* analysis is the less stringent question whether the defendant has shown "race was *significant* in determining who was challenged and who was not." 545 U.S. at 252, 162 L. Ed. 2d at 221 (emphasis added). The entire record indicates that, despite this misstatement, the trial judge applied the correct standard. When explaining to defense counsel its initial burden of establishing a prima facie case, the trial judge stated: "My understanding is that you have the burden of making a prim[a] facie showing that [the State] has exercised the challenge, and it was *motivated* by discriminatory purposes." (Emphasis added.) Later in the jury selection process, defendant again raised a *Batson* objection when the prosecutor exercised a peremptory challenge against prospective juror Francine Johnson. The trial court heard defendant's reasons, then asked the prosecutor

to "provide rebuttal reasons why the peremptory challenge was not *motivated by* racial or gender discrimination." (Emphasis added.) These statements demonstrate that the trial court did not consider defendant's *Batson* challenges in the mistaken belief that defendant was required to establish that race was the sole reason for the State's peremptory challenge of a prospective juror. Accordingly, we conclude that the trial court's *lapsus linguae* did not indicate that it was applying an incorrect standard to defendant's *Batson* challenges.

Moreover, the record shows the trial court found defendant failed to meet the initial *Batson* requirement of demonstrating a prima facie case that the prosecutor's challenge of prospective juror Rogers was based upon improper racial discrimination. The trial court's ruling that defendant had not made a sufficient initial showing preceded, and thus was not based on, the State's subsequently proffered race-neutral reasons for its peremptory challenge.

**[9]** Defendant next argues that the State impermissibly used a peremptory challenge against prospective juror Francine Johnson based on her race. Johnson, an African-American female, was the thirtieth prospective juror and the eighth African-American prospective juror to be examined. Although two African-American jurors ultimately were chosen (one sat as a juror, the other as an alternate), at this point none had been selected, with six having been excused for cause and one excused peremptorily by the State.

After the trial court obtained initial background and biographical information, the State began its voir dire by asking Johnson her views on the death penalty and whether she had thought about it since being asked to consider it when she first reported for jury duty the previous week:

Prosecutor: . . . [L]et me start with your personal views about capital punishment. Are you opposed to the death penalty?

Ms. Johnson: I really haven't thought about it one way or the other.

Prosecutor: Okay. Before—before you were called here last Tuesday morning, you really hadn't considered your views about the death penalty, ma'am?

Ms. Johnson: Yes.

Prosecutor: Is that correct?

Ms. Johnson: Yes.

Prosecutor: And on Tuesday, do you recall the judge saying if you hadn't thought about it, you need to start thinking about it?

Ms. Johnson: Yes.

Prosecutor: And have—you still haven't had the opportunity to formulate your personal opinion about the death penalty?

Ms. Johnson: No, not really.

Prosecutor: Well, have you—over this last week, at least since last Tuesday, it's Tuesday now. So over the last week, have you —have you been thinking about it?

Ms. Johnson: Yes.

Prosecutor: Okay. Well, what—what have you been thinking about? Tell me what's kind of been going through your mind over the last week about this issue of capital punishment?

Ms. Johnson: Well, I thought about it and I thought—I tried to think of it in a personal level, how I would feel if something were to happen to somebody in my family. And then I try to think of it as a person if something were to happen where one of my family members were accused—

Prosecutor: Accused?

Ms. Johnson: —of—yes.

Prosecutor: Okay, all right.

Ms. Johnson: And I still didn't come up with a position where I would be swayed in either way. So I just took the same position.

Prosecutor: All right. Same position, which is you don't quite know what your position is, is that fair?

Ms. Johnson: That's it.

The prosecutor then went on to describe a juror's responsibilities in a capital case and the circumstances under which a defendant can be sentenced to life imprisonment or death, and Johnson stated that she understood. The prosecutor then asked if she could participate in the process:

Prosecutor: . . . [T]ell me if you believe that you could participate in the process, and under the appropriate circumstances, personally vote to impose a sentence of death?

Ms. Johnson: Yes.

Prosecutor: Okay. And tell me if you could personally partic-ipate in the process and under the appropriate circumstances, personally vote to impose a sentence of life without parole?

Ms. Johnson: Yes.

Asked if she would have any reluctance performing her duties, Johnson responded, "No," and added that she would look at the evidence to help her decide the issue.

The prosecutor pursued other lines of questioning including her occupation, education, hobbies, and activities. Johnson responded that she drove a city bus, had some college education, belonged to a church, and enjoyed reading and watching cartoons and reality shows on television. Johnson acknowledged that she had been arrested for driving an automobile with an altered VIN number, but added that the charges were dropped when the person whose car she had been driving "stepped up." She responded, "No," when the prosecutor asked if she had any religious or personal objections to sitting in judgment of someone.

The prosecutor peremptorily challenged prospective juror Johnson. Defendant objected on *Batson* grounds, pointing out that this peremptory challenge was the State's second and that both such challenges had been against African-American females of about the same age who averred that they could impose the death penalty. Defendant argued that Johnson's answers were neutral and that she had said she could follow the law and vote to impose a recommendation of death. Defendant contended that "other than the race and perhaps gender, in combination thereof," there was no reason based on her answers to warrant a challenge. The trial court ruled that defendant had made a prima facie showing and directed the State to provide race-neutral reasons for the challenge.

The prosecutor responded:

First of all, Ms. Johnson, who was born in 1957 by her jury questionnaire, before last Tuesday, being called for jury duty, had never formulated her personal views or opinions about the death penalty. Your Honor specifically told all potential jurors that day, that's a week ago, as of this date—I think we can all agree that was last Tuesday, this is now the next Tuesday—you said if you hadn't, you need to start thinking about it, in formulating your opinions.

STATE v. WARING

[364 N.C. 443 (2010)]

She came here, and she still couldn't tell me one way or the other what her opinions about capital punishment are. So I agree, as Ms. Godwin said, neutral, that begs the question.

I don't know what her personal views about the death penalty are, and it concerns me when someone who is born in 1957 can't articulate their own personal views about capital punishment, particularly after your Honor told them about a week ago, told them you need to start considering that because they're going to be asked that type of question.

The next thing that I thought—again, not to harp on the— some other things about her, and I'll go back about the death penalty, but she seems to be completely removed from any type of local, national news, or print media or anything. I was—I'm concerned about—not concerned, but she doesn't watch the news or read the news, but she does enjoy watching cartoons.

Again, you think of a lady that was born in 1957 who hasn't formulated opinions about [the] death penalty, these things are starting to concern the State.

And I'll be clear with your Honor, it's going to be the State's position in this case that at least felony murder seems to be a rather certain verdict. This is a confession case. I'm looking at the punishment phase, and I'm looking for jurors at this time who are not opposed to the death penalty, and who can obviously impose it under the appropriate circumstances.

Those—that's really what I've been looking at right now, particularly when I have the luxury of no perempts or one perempt[], or—up to this point being used, and the defendant has burned, I think maybe five, okay?

At some point you—you can't get too picky about the death penalty views and how personally strong you're looking for, but if—if you've got a pretty good comfort zone with the perempts, you can—you don't need to maybe start taking jurors whose views are not ideally what you're talking for about the death penalty. And I'm talking about the death penalty. I'm not talking about gender, I'm not talking about race.

Which brings up another question. I have never mentioned race in any of my remarks to any potential jurors. My question to all potential jurors—I would ask your Honor to observe, there's been no disparate treatment of any male, female or whatever race

in my questioning. And in fact, I have never mentioned race in any of my questions to any potential jurors.

The defense has, and that's fine. They should inquire of that, if they think that's appropriate, but I haven't. So I'd ask you to consider that.

Also, Judge, this juror has—she wrote down that she was arrested and VIN—I couldn't figure out what that meant, VIN number not correct, dropped.

She's been—we checked on the AOC. She, as she admitted, she was charged with a felony. Yes, your Honor, she was charged with a felony. I am trying not to, if I can help it—that's important to me, regardless of the disposition, someone has been charged with a felony. That's different than someone that's been charged or convicted of—of you know, DWI, okay?

That's—that's kind of the a whole 'nother little thing to look at. She proffered the reason, that was the extent of her criminal record, and it was dropped because someone else came and took the blame, something to that—someone else stepped up, or whatever her comment was. Someone else came and made a statement or took the blame.

Well, if you look on AOC, the case was actually arrested, Judge, September 20th of '95, in Wilson. She was indicted in October of '96. It wasn't dismissed until March of '98 in Superior Court. And if you look at the AOC, it says unable to locate victim in felony case. There [were] two charges, and if you look at the companion case, it says unable to locate the victim in a felony case.

That's—that's what I have on the AOC, Judge, okay? I've heard her explanation. On top of her explanation, it's a felony charge. On top of that, it's not something that was summarily quickly dispatched because there was an error. She, in fact, was indicted. It stayed pending for—I can't do the math—is that more than a year, two years, going into three years. And at least the AOC doesn't proffer the reason she said.

On top of that, if you want to keep looking on AOC, you'll find other convictions on there, Judge, including failure to return rental property in Edgecombe County with a Buena Vista Avenue address. She was convicted of that. There's also in that same—in that same Nash County, but again, her—there appears to be

2-18-57 same date of birth, so open container case on the street. That's not too concerning at all, but the return rental property, that's not mentioned. But all of that—and if you actually look, there's some other cases out of Rocky Mount. It's unclear if it's her or not, for some simple assault—a conviction and maybe a VL'd case.

But let's just put that aside, let's say that's not her. I don't know, but the felony charge that wasn't quickly, you know, dropped because someone else stepped up, but that was, in fact, indicted and stayed pending for a couple years. And the AOC says unable to locate victim. These are concerns to the State.

So when you add up that race neutral, gender neutral reason, her inability to say anything other than she doesn't have—hasn't been able to formulate an opinion about the death penalty, all of this leads me to believe—while I do have a pretty good number of peremptories left, that this is not a juror, given a case where it's [a] confession case, and I do believe we'll get into a penalty phase, I'm looking for some strong people on the death penalty.

Defendant responded that the prospective juror's answers to questions about the death penalty were neutral and reflected that she could follow the requirements of the law, and also that she appeared more comfortable and was more unequivocal in her responses than similarly situated white jurors passed by the State. As to the prosecutor's comments about Johnson's record, defendant pointed out that she had not been asked about some of the purported offenses and suggested she might not be the individual reflected in the criminal records. As to the charge involving an automobile's VIN, defendant noted that the resolution of that matter was unclear. Defendant added that other passed jurors had criminal charges or convictions and that Johnson's answers about the death penalty were consistent with, and perhaps less equivocal than, the answers given by jurors the prosecutor had not challenged.

After considering arguments of counsel, the trial court found that the prosecutor's proferred explanation of the challenge satisfied his burden of establishing nondiscriminatory reasons for the challenge and that defendant had failed to prove that the State was acting in a racially discriminatory manner.

In reviewing the trial court's finding, we note that during the entire course of jury selection, the prosecutor exercised nine peremptory challenges. Of these, two were against African-

Americans. Of the four African-American prospective jurors who were not excused for cause, two were challenged peremptorily by the prosecutor, one served as a juror, and one served as an alternate, yielding a fifty percent acceptance rate of African-American prospective jurors by the State. These numbers do not suggest a systematic effort on the part of the State to prevent African-Americans from serving as jurors.

Nevertheless, as detailed above, the improper peremptory challenge of even one prospective juror on racially improper grounds constitutes a *Batson* violation, so statistics tell only part of the story. *See Barden*, 356 N.C. at 344, 572 S.E.2d at 127-28 (noting that "numerical analysis . . . is not necessarily dispositive," but "can be useful" in determining "whether a *prima facie* case of discrimination has been established" (citations omitted)). We are mindful that "[m]ore powerful than . . . bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." *Miller-El*, 545 U.S. at 241, 162 L. Ed. 2d at 214. While a prosecutor's reason for exercising a peremptory challenge can appear race-neutral when standing alone, a comparative analysis may provide a more reliable gauge of its plausibility. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Id.*

The prosecutor proffered as race-neutral reasons for his peremptory challenge of prospective juror Johnson that she had never formulated her views on the death penalty either over the course of her life or after being admonished to do so by the judge when she first reported for jury duty, that she did not read the newspaper or watch the news, and that she had been charged with a felony and both her jury questionnaire and testimony concerning the disposition of the charges were inconsistent with the "AOC records" (North Carolina Administrative Office of the Courts Automated Criminal/Infractions System). We will address each of these reasons in the context of the prosecutor's examination of similarly situated white jurors who were not peremptorily challenged by the prosecutor.

First, the prosecutor contended that he was concerned that Ms. Johnson did not have established views on the death penalty. Defendant responds that this proffered race-neutral reason is pretextual in light of similar answers given by jurors Metz, a white male, and Skiff, a white female, both of whom served on the jury. The record

shows that when the prosecutor asked as his first question if she was opposed to the death penalty, Johnson responded, "I really haven't thought about it one way or the other." Moreover, further questioning by the prosecutor revealed that Johnson was unable to articulate an opinion despite being instructed the previous week to consider the issue if she had not done so already. In contrast, as previously noted, prospective jurors Metz and Skiff each responded to the prosecutor's initial voir dire question by stating that they were not opposed to the death penalty. Specifically, prospective juror Metz indicated that he had never been opposed to the death penalty and, in fact, believed it was necessary, but too expensive: "I think it's necessary. It's a good deterrent for some crimes. I think it's too expensive right now." Although imposing capital punishment "would be a harder decision than I thought it would be . . . before I came in this courtroom," he had concluded that "it's necessary." Prospective juror Skiff also stated that she was not opposed to the death penalty, although she acknowledged that death would not be her "plan A." "I think it would be pretty hard, and thankfully there would be a bunch—you know, a jury to help with that."

Although Johnson, Metz, and Skiff all indicated they believed they could ultimately impose the death penalty under the appropriate circumstances, only juror Johnson had failed to define for herself her position on the death penalty at the time the prosecutor began his questioning. In fact, after a careful examination of the record, we find that no juror was accepted by the State who did not respond, "No," to the State's first voir dire question asking whether he or she was opposed to the death penalty. Accordingly, this reason offered by the State does not appear to be pretextual.

The prosecutor's second proffered race-neutral reason, that Johnson was "completely removed from any type of local, national news, or print media," also does not appear to be pretextual. While this reason may not be as compelling as the first, no prejudicial intent appears when Johnson's answers are compared with the voir dire responses of other prospective jurors who previously had been questioned and accepted by the State. For instance, juror Skiff answered that she received the newspaper daily, juror Metz indicated he subscribed to the local newspaper, juror Rickard responded that he read the newspaper every day, and juror Wilson advised that he watched local and national news daily.

The prosecutor also gave Johnson's prior criminal charges as a third race-neutral reason for his peremptory challenge. Defendant

argues that the State accepted white prospective jurors who had analogous criminal records and that this proffered reason was pretextual. Defendant's argument here is in two parts. First, defendant argues in his brief that the prosecutor had accessed AOC's records to check on Johnson's criminal history, but there was "no indication that the State had done this for any white juror; indeed, the indications are the opposite." To support this claim, defendant points out that the prosecutor advised the court during the voir dire of prospective juror Johnson that her responses pertaining to her criminal history were inconsistent with the criminal records maintained by AOC. In contrast, prospective juror Wilson, a white male who was ultimately seated, had checked the box on his jury questionnaire labeled "Yes" in response to the question whether he had been arrested, then further responded on the questionnaire that the charge had been "DUI" and the resolution had been "Guilty." As detailed below, the trial court later determined from AOC records that prospective juror Wilson had two DUI convictions, but the record does not indicate whether the prosecutor had accessed this prospective juror's AOC records prior to voir dire. Thus, argues defendant, the record suggests that the prosecutor was running record checks on minority jurors only.

Prospective juror Johnson's answer on her questionnaire to the question pertaining to prior charges against her was "VIN # not correct." The prosecutor stated to the court that he was uncertain what this response meant and, in the absence of additional information, further investigation by the State was neither inherently unreasonable nor indicative of racial discrimination. We are unwilling to conclude from this sparsely developed record that the prosecutor's pretrial clarification of prospective juror Johnson's criminal record was racially motivated.

The second part of defendant's argument is that other similarly situated white jurors with criminal records were not challenged peremptorily. As noted above, prospective juror Johnson indicated on her juror questionnaire that she had been charged with an incorrect vehicle identification number. When the prosecutor asked for details about this charge during voir dire, Johnson indicated that it had been dismissed because "[another] person said that, you know, they did it." However, the AOC records indicated that, over two years after she was charged, the case was dismissed because the State was unable to locate the victim. In addition, the State discovered in the AOC database other charges against prospective juror Johnson. The

prosecutor cited her felony charge, her other undisclosed charges, and her somewhat enigmatic and unsupported explanation for the resolution of the charge involving the false VIN number as grounds for his peremptory challenge.

Defendant compares the treatment of prospective juror Johnson with that accorded prospective juror Wilson, a white male who, as noted above, was not challenged, contending that the difference reveals the pretextual nature of the State's proffered reason. When asked via his jury questionnaire whether he had been arrested, Wilson checked the box labeled "Yes," then wrote that the charge had been "DUI" and the result was "Guilty." During his voir dire Wilson explained that he had received a DUI conviction in 1993. However, when the prosecutor advised that he was satisfied with prospective juror Wilson, the trial court asked Wilson to step out of the courtroom. The judge then advised counsel that, while the prosecutor was conducting his voir dire, the judge had used his laptop computer to check the AOC records on Wilson and had discovered that he had been convicted of two DUIs, one in 1990 and another in 1993. The prosecutor initially advised the court that the State did not wish to inquire further about those charges, but, after further discussion between the court and counsel, readdressed the issue when prospective juror Wilson returned to the courtroom. The prosecutor asked how many times he had been convicted of DUI and when and where they had occurred. Wilson responded, "Twice. . . . Here in Wake County 1990, 1993." When asked why he didn't list two DUIs on the questionnaire, Wilson responded, "No reason in particular, no." The prosecutor then again stated that he was satisfied with prospective juror Wilson.

Defendant argues that the disparate treatment of these prospective jurors reveals that the prosecutor's explanation for his peremptory challenge of prospective juror Johnson was pretextual. However, the record indicates that these two prospective jurors were not similarly situated. Wilson's voir dire testimony was ultimately consistent with the AOC records, while Johnson's voir dire responses were inconsistent and incomplete. Second, as the prosecutor noted, Wilson's unrevealed conviction was of a misdemeanor, while Johnson had been charged with a felony, and the prosecutor passed other jurors whose brushes with the law apparently involved only misdemeanors. Finally, Wilson stated forthrightly that he was not opposed to the death penalty, whereas Johnson equivocated. The pattern revealed in the treatment of these two prospective jurors is consist-

ent with the State's acceptance of only those jurors who were not opposed to the death penalty.

After considering all the relevant circumstances, we conclude that the State's proffered race-neutral reasons were not pretextual and that race was not a significant factor in the strike of Francine Johnson. Because there was no evidence of purposeful discrimination, the trial court was not clearly erroneous in denying defendant's *Batson* claim.

At oral argument, defendant contended that we should remand this case to the trial court for further findings of fact in light of *Snyder v. Louisiana,* in which the prosecutor peremptorily struck a prospective black juror who was a college senior attempting to complete a student teaching obligation. 552 U.S. at 478, 170 L. Ed. 2d at 181-82. The prosecutor proffered as race-neutral reasons for the strike that the prospective juror appeared nervous during the questioning and that the prospective juror's missing his student-teaching classes might impair his ability to be a fair and impartial juror. *Id.* at 478, 170 L. Ed. 2d at 182. The trial judge overruled the defendant's *Batson* objection, stating only that he was allowing the challenge. *Id.* at 479, 170 L. Ed. 2d at 182.

In reviewing the challenge, the Supreme Court did not discount the prosecutor's first reason, that the juror was nervous, but noted that "deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a [peremptory] strike." *Id.* The trial judge in *Snyder* allowed the challenge without making a specific finding about the prospective juror's nervousness, so the Supreme Court could not "presume that the trial judge credited the prosecutor's assertion that [the juror] was nervous." *Id.* Consequently, the Court could review only the State's second reason, that the juror might go along with a lesser verdict in order to complete jury duty more quickly and return to his teaching responsibilities. After comparing the circumstances presented by this prospective juror with other similarly situated white jurors who were not challenged peremptorily by the prosecutor, the Court held that the peremptory challenge was "motivated in substantial part by discriminatory intent." 552 U.S. at 485, 170 L. Ed. 2d at 186. Accordingly, the Court ruled that the trial court erred in overruling petitioner's *Batson* challenge.

We do not believe *Snyder* applies to the case at bar because the pertinent peremptory challenges do not involve demeanor or

any other intangible observation that cannot be gleaned from the record. Consistent with *Snyder*, we encourage the trial courts to make findings where necessary to elucidate aspects of the jury selection process that are not preserved on the cold record so that review of such subjective factors as nervousness will be possible. However, the absence of such a finding will not preclude appellate review when the record permits objective review of sufficient pertinent factors. Therefore, no remand is required.

**[10]** In addition to his issues relating to *Batson*, defendant raises other issues relating to jury selection. Defendant contends the trial court erred in allowing the State's challenge for cause of prospective juror Ewbank based on his beliefs concerning the death penalty. Here, Ewbank answered the prosecutor's first question, asking whether he was opposed to the death penalty, by stating that he had "two answers." He explained that his head and his heart were in conflict, and while his head understood that "the law is the law," his heart was "not for capital punishment." The prosecutor next summarized the procedures used in a capital trial and sentencing proceeding, then asked Ewbank if he could vote for capital punishment. When Ewbank responded that he was "still undecided," the prosecutor asked him a few more general questions, then again sought a more specific response:

> Prosecutor:  . . . . What I'm hearing from you is that the conflict that you have going on inside you, between your heart and mind, is precluding you from being able to vote to impose a sentence of death and have someone executed, if you're required to sit as a juror in the case, that's what I'm hearing from you.

> Mr. Ewbank:  I [sic] that's a fair assessment.

Additional questioning by the State led only to repeated assertions by Ewbank that he did not know if he could vote in favor of death in a sentencing proceeding.

> When the State challenged prospective juror Ewbank for cause, the trial court asked him a few questions and received similarly hair-splitting and unilluminating responses. Defense counsel's attempts to rehabilitate Ewbank were unavailing, as indicated by the following exchange:

> Defense counsel:  . . . . [W]hat I'm asking is if for you, if—if the State, under what I've just discussed with you as a first-degree murder, if you could ever consider a sentence of death if

the State brought you the quality and the quantity of evidence that fully satisfied and convinced you in your heart, beyond a reasonable doubt, that death was the appropriate punishment?

Mr. Ewbank: I think I answered that. I said [that] the word "ever" in the sense of an engineer can be some pretty long odds. And if you used the word "ever," I tend to have to answer "yes."

Defense counsel: Okay.

Mr. Ewbank: But almost any other word in there I'd say[,] "I don't know."

Based on this record, the trial judge concluded that Mr. Ewbank's demeanor and testimony showed that his views "would prevent or at least substantially impair his performance as a juror" and allowed the State's challenge for cause.

We have held that "[a] trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled, and its rulings concerning jury selection will be reversed only upon a showing of abuse of discretion." *State v. Anthony*, 354 N.C. 372, 395, 555 S.E.2d 557, 574 (2001) (citation omitted), *cert. denied*, 536 U.S. 930, 153 L. Ed. 2d 791 (2002). If a juror's views about the death penalty would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath,' " that juror may be excused for cause. *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). Even when a juror's opinions toward the death penalty cannot be proven with " 'unmistakable clarity,' " *id.* at 424, 83 L. Ed. 2d at 852, the Supreme Court has recognized that situations will arise "where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law," *id.* at 425-26, 83 L. Ed. 2d at 852. In such situations deference must be given to the trial court's judgment. *Id.* at 426, 83 L. Ed. 2d at 853.

Prospective juror Ewbank's beliefs could not be pinned down. The trial court was in the best position to observe and evaluate his responses, and we defer to the court's ruling concerning Ewbank's ability to serve as a juror and follow the law applicable to a capital sentencing proceeding. Accordingly, the trial court did not abuse its discretion in allowing the State's challenge for cause.

[11] Defendant's next contention involving jury selection is that the trial court erred in denying his motion to dismiss on the basis of pur-

ported constitutional violations in the jury selection process. Specifically, defendant complains that the jury selection violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution because disproportionate numbers of prospective jurors who were African-American or who opposed the death penalty, or both, were excluded from the jury in violation of *Wainwright v. Witt* and *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968). Under *Witherspoon*, as clarified by *Witt*, a juror may not be excused for cause unless their views on the death penalty would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Witt*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52 (quoting *Adams*, 448 U.S. at 45, 65 L. Ed. 2d at 589).

As to defendant's *Witherspoon-Witt* argument, we note that the trial court applied virtually verbatim the test enunciated in *Witt*. As defendant concedes, this Court has held that death qualifying a jury in a capital case does not violate the United States Constitution or the North Carolina Constitution. *State v. Barts*, 316 N.C. 666, 677-78, 343 S.E.2d 828, 836-37 (1986). Although defendant asks that we reconsider *Barts*, we decline to do so.

[12] Next, defendant contends the trial court erred by barring statements made by defense counsel during voir dire concerning the jury's application of North Carolina law during the sentencing proceeding. Specifically, defense counsel stated to prospective juror Seitzinger that "there's a presumption that life without parole is the appropriate sentence." After Seitzinger was excused for cause, the State objected to any further such statements, arguing that because the jury had to be unanimous in imposing life or death, "[t]here is no presumption, one way or the other." The trial court sustained the objection. Later, during the voir dire of another prospective juror, the State again successfully objected to defense counsel's statement that

> the law is always satisfied with a life sentence. It never demands a death penalty for a first-degree murder case. And it would be the State's obligation to prove, to each and every juror, beyond a reasonable doubt, or all twelve unanimously agreed, that death is the appropriate punishment, before a jury can return a recommendation for a death sentence.

Defendant argues that the trial court's rulings were erroneous because, under North Carolina law, if the defendant is convicted of first-degree murder but the State fails to convince the jury unani-

mously beyond a reasonable doubt of the existence of aggravating circumstances, the trial court will impose a life sentence even if the jury is not unanimous that life is appropriate. Thus, argues defendant, until an aggravating circumstance is proven, life is not only the presumed sentence, it is the only sentence.

North Carolina General Statute section 15A-2000(b) provides that in a capital sentencing proceeding, "[t]he sentence recommendation must be agreed upon by a unanimous vote of the twelve jurors." N.C.G.S. § 15A-2000(b) (2010). However, "[i]f the jury cannot, within a reasonable time, unanimously agree to its sentence recommendation, the judge shall impose a sentence of life imprisonment." *Id.* We have observed that the General Assembly's statutory scheme has the "pronounced advantage" of allowing the trial court to impose a life sentence at the end of the trial "without encouraging any juror to vote for death or life without honestly deliberating with the other jurors, simply because he or she has been informed that he *alone* may *require* that a sentence of life be entered by holding out against the other eleven jurors." *State v. McCarver,* 341 N.C. 364, 393, 462 S.E.2d 25, 41 (1995), *cert. denied,* 517 U.S. 1110, 134 L. Ed. 2d 482 (1996), *see also McKoy v. North Carolina,* 494 U.S. 433, 452, 108 L. Ed. 2d 369, 387 (1990) (Kennedy, J., concurring in judgment) (stating that the jury unanimity requirement "is an accepted, vital mechanism to ensure that real and full deliberation occurs in the jury room, and that the jury's ultimate decision will reflect the conscience of the community"). Although the trial court will perforce impose a sentence of life imprisonment when a jury is unable to agree in a capital sentencing proceeding, this Court has held that it would be "improper" for a trial court so to inform a jury prior to its deliberations. *State v. Johnson,* 317 N.C. 343, 390, 346 S.E.2d 596, 622 (1986). North Carolina law does not establish a presumption in favor of a life sentence. The trial court's rulings were correct.

[13] In his final arguments related to jury selection, defendant contends that the State injected error in its voir dire of prospective jurors when it stated that the jury had to be unanimous in the sentencing proceeding as to a sentence either of death or life without parole. During his routine introduction of the capital sentencing process to each prospective juror, the prosecutor declared that the State has the sole burden of proving that aggravating circumstances exist, that the aggravating circumstances outweigh the mitigating circumstances, and that the aggravating circumstances are "sufficiently substantial" to warrant the death penalty. The prosecutor went on to explain to

each prospective juror that if the State failed to meet those burdens "in any respect, it would be the jurors' duty to impose life imprisonment without parole." Defendant objected and argued, as he does before this Court, that the prosecutor's comments omitted the requirement that the State must also establish that the aggravating circumstances found by the jury were sufficiently substantial to call for the death penalty when considered against the established mitigating circumstances. However, any omission by the State during voir dire was remedied by the trial court's correct instructions, which the jury is presumed to follow. *State v. Tirado*, 358 N.C. 551, 581, 599 S.E.2d 515, 535 (2004) (citations omitted), *cert. denied*, 544 U.S. 909, 161 L. Ed. 2d 285 (2005).

[14] Defendant further argues that the prosecutor's comments erroneously indicated that the jury had to recommend a life sentence unanimously, thus effectively placing a burden on defendant, when in fact the trial court will impose a life sentence if the jury cannot agree during a capital sentencing proceeding. As discussed above, any jury recommendation requiring a sentence of life in prison or death must be unanimous. N.C.G.S. § 15A-2000(b); *McCarver*, 341 N.C. at 388-94, 462 S.E.2d at 38-42. "[T]he jury should answer Issues One, Three, and Four on the standard [jury] form used in capital cases either unanimously 'yes' or unanimously 'no.'" *McCarver*, 341 N.C. at 390, 462 S.E.2d at 39. While defendant is correct that an inability to reach unanimity in a capital sentencing proceeding will result in a life sentence, we held in *McCarver* that the jury is not to be instructed as to the result of being unable to reach a unanimous sentencing recommendation. 341 N.C. at 394, 462 S.E.2d at 42. Accordingly, the prosecutor did not impose an additional burden of proof on defendant and the trial court did not err by overruling defendant's objection. Nor did the State reduce its burden when it asked some prospective jurors to presuppose that defendant had been found guilty. Such a supposition was a necessary prelude to voir dire questions relating to the sentencing proceeding, should one be needed.

## TRIAL ISSUES

[15] We turn now to the issues defendant raises pertaining to the trial. Defendant argues that the trial court erred in permitting the State to introduce for illustrative purposes eighteen autopsy photographs of the victim. Defendant argues that the photographs were inflammatory and repetitive and that their probative value was outweighed by their prejudicial effect.

In determining whether to admit such photographs into evidence, the trial court must weigh their probative value against the danger of unfair prejudice to a defendant. N.C.G.S. § 8C-1, Rule 403 (2010). This determination rests in the sound discretion of the trial court and will not be reversed unless it is "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988) (citation omitted). Photographs are not inadmissible simply because they are gruesome or tend to inflame the jury, "even where the photographs depict remains in an advanced state of decomposition and where the cause of death is uncontroverted." *State v. Harris*, 323 N.C. 112, 127, 371 S.E.2d 689, 698 (1988) (citation omitted).

After eliciting testimony from Cynthia Gardner, M.D. regarding her findings from the autopsy performed on the victim, the State asked Dr. Gardner to identify autopsy photos marked as State's Exhibits Five through Twenty-two. The State asked whether the photos accurately depicted the victim's body during the autopsy, whether they would help her explain to the jury the location of the victim's injuries, and whether they accurately depicted all the injuries to which Dr. Gardner had previously testified. Based on Dr. Gardner's affirmative responses, the State moved to introduce the photos into evidence. When defendant objected that the photographs were excessive, repetitive, and inflammatory, the trial court reviewed the tendered photos, noted that they "appear to depict independent injuries" and "[do] not appear to be repetitive," and admitted them into evidence.

We have carefully reviewed the record and the photographs and conclude that the trial court did not abuse its discretion by admitting the photographs. They were relevant and probative of material facts in this case. The photos were not unnecessarily repetitive, were not unduly gruesome or inflammatory, and illustrated both Dr. Gardner's testimony pertaining to the autopsy and corroborating statements made by defendant to the investigators. Accordingly, the trial court did not err in admitting them.

[16] Defendant next contends the trial court erred in sustaining the State's objection to defense counsel's recross-examination of law enforcement officers concerning Joseph "Joey" Sanderlin, who participated with defendant in killing the victim. Defendant refers specifically to his question to Detective Taylor whether, when she first interviewed Sanderlin and obtained DNA samples from him, he

"denied any involvement in the rape or the murder of [the victim]." Defendant claims he sought this testimony regarding Sanderlin's lack of cooperation with police because this evidence was relevant to defendant's proposed (f)(8) mitigating circumstance, that defendant aided in the apprehension of a capital felon. Defendant also argues this evidence was relevant because the State was proceeding under the theory that defendant and Sanderlin acted in concert.

The range of cross-examination, though broad, is subject to the trial judge's discretionary powers "to keep it within reasonable bounds." *State v. Newman*, 308 N.C. 231, 254, 302 S.E.2d 174, 187 (1983) (citation omitted). The trial court's rulings on cross-examination "will not be held in error absent a showing that the verdict was improperly influenced thereby." *State v. Sams*, 317 N.C. 230, 240, 345 S.E.2d 179, 185 (1986) (citation omitted). After Detective Taylor identified in her direct examination a photograph of Joseph Sanderlin and the oral swabs she had taken from him for DNA testing, the prosecutor asked how she had obtained the samples. Taylor responded that she asked Sanderlin for them and he consented. She then described the process of taking and preserving the swabs. On cross-examination, defense counsel asked Taylor about obtaining similar samples from Sanderlin and had the detective identify a photo of him.

Defense counsel then asked whether "[w]hen you went and talked to Mr. Sanderlin and got his DNA samples, he denied any involvement in the rape or the murder of [the victim]?" When the State objected on the grounds that the answer would be inadmissible hearsay, defendant responded that the testimony was not being offered for the truth of the matter asserted but instead to indicate that Sanderlin was not cooperative. Defendant also contended that the State opened the door to the admission of this testimony during its direct examination of Taylor and by the admission of evidence from other witnesses who did not testify.

To the extent that the testimony pertained to the substance of Sanderlin's statements to Taylor, it is hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial, or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (2010). Defendant has not shown how Sanderlin's purported lack of cooperation or denial of his own culpability was relevant to defendant's guilt. At the time defendant sought to elicit this evidence, the question before the jury was whether defendant was guilty of first-degree murder either on the

basis of malice, premeditation, or deliberation, or under the felony murder rule. Defendant had already admitted that he had robbed the victim; that he had held her down while Sanderlin raped her; and that he had punched and stomped the victim in the face, stabbed her, and cut her throat. In light of this evidence, Detective Taylor's testimony relating to Sanderlin's response to a warrant would bear little, if any, relevance to the jury's consideration of defendant's culpability. Furthermore, the State's questions relating to Taylor's encounter with Sanderlin did not elicit any responses that required an explanation or rebuttal or otherwise opened the door for defendant to elicit Sanderlin's statement on cross-examination. *See, e.g., State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981).

Although defendant argues that he was asking the question only to demonstrate Sanderlin's lack of cooperation and thereby establish that the (f)(8) mitigating circumstance applied to defendant, the exchange occurred during the guilt portion of defendant's trial. At the subsequent sentencing proceeding, defendant's counsel argued to the jury that it should find the (f)(8) mitigating circumstance. The trial judge instructed on this statutory mitigating circumstance and told the jury that Sanderlin is a capital felon, and the verdict form indicated that one or more jurors found the existence of this mitigating circumstance. Accordingly, the trial court did not abuse its discretion in sustaining the State's objection to this evidence, and defendant was not prejudiced thereby.

[17] Next, defendant presents several issues relating to the State's closing arguments in the guilt-innocence portion of the trial. Of these, defendant first argues the trial court committed plain error when it failed to intervene *ex mero motu* during the State's purportedly improper closing argument. " 'The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*.' " *State v. McNeill*, 360 N.C. 231, 244, 624 S.E.2d 329, 338 (citations omitted), *cert. denied*, 549 U.S. 960, 166 L. Ed. 2d 281 (2006). "Under this standard, '[o]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken.' " *Anthony*, 354 N.C. at 427, 555 S.E.2d at 592 (citation omitted). "To establish such an abuse, defendant must show that the prosecutor's

comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998) (citation omitted), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999).

In its closing argument, the State suggested that a mark seen on the victim's forehead in one of the photographs had been caused by defendant's shoe. Specifically, the prosecutor stated: "You can look at the forehead impression, is that a footprint, I don't know, but he even tells you he stomped on her face a couple [of] times." Earlier in the trial, forensic pathologist Gardner testified that the autopsy she performed on the victim identified "[o]n the right forehead . . . a red contusion" that "appear[ed] to be a pattern of linear red lines." While Gardner was unable to identify the cause of the mark, other evidence admitted at trial indicated that defendant acknowledged that he had punched and stomped the victim in the face. Thus, the evidence at trial supported the prosecutor's implication that defendant's shoe caused the mark. Because "[c]ounsel is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn therefrom," *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986) (citations omitted), the prosecutor's remark was not grossly improper.

**[18]** Defendant next contends the prosecutor injected his personal opinion as to defendant's guilt of first-degree murder based upon felony murder when the prosecutor argued:

> I think the evidence is overwhelming, the defendant is guilty under that theory of first-degree murder. I believe the evidence is overwhelming that the defendant is guilty of first-degree felony murder during the perpetration of a robbery, also. The evidence is clear, when you apply the law to the facts.

This argument was obviously improper. "During a closing argument to the jury an attorney may not . . . express his personal belief . . . as to the guilt or innocence of the defendant . . . ." N.C.G.S. § 15A-1230(a) (2010). However, this argument also related the strength of the evidence to the theories under which defendant was being prosecuted and which would be presented shortly to the jury on the verdict sheets. Defendant failed to object, and we do not believe this unfortunate argument was so grossly improper that it "infected the trial" so as to "render[] the conviction fundamentally unfair." *State v. Lemons*, 348 N.C. 335, 356, 501 S.E.2d 309, 322 (1998) (citation omitted), *judgment vacated on other grounds*, 527 U.S.

1018, 144 L. Ed. 2d 768 (1999). Accordingly, the trial court did not err by failing to intervene *ex mero motu.*

**[19]** Defendant also argues that the prosecutor made an improper argument about intent. Defendant refers to the prosecutor's comments on the location of one of the stab wounds suffered by the victim as evidence that Sanderlin intended to kill, which was relevant to the State's theory that Sanderlin and defendant acted in concert. The State argued:

> But during that time is when Joey [Sanderlin], using his knife that he's brought with him, according to the defendant, starts to stab [the victim] in the neck, in the neck. That's a vital area. It's a vital area. I think it's an excellent indication of Joey's intent, when you stab someone in the neck. And you can recall the pictures, I'm not going to bring them out here for you at this time. But that's an excellent indication.

We have stated that "[a]n intent to kill is a mental attitude, and ordinarily it must be proved, if proven at all, by circumstantial evidence, that is, by proving facts from which the fact sought to be proven may be reasonably inferred." *State v. Cauley,* 244 N.C. 701, 708, 94 S.E.2d 915, 921 (1956). Here the State was discussing application of the law to the circumstantial evidence that had been introduced. While, as above, the prosecutor's injection of his own opinion was an error, in the absence of an objection we do not find that the trial court erred in failing to intervene *ex mero motu.*

**[20]** Next, defendant contends that the State improperly argued that defendant committed burglary. During closing arguments, and in the context of describing premeditation and deliberation, the State remarked that Sanderlin's mode of entry, which the prosecutor characterized as "unlawfully breaking and entering [the victim's] dwelling . . . at night, with the intent to commit a felony," constituted "burglary." Defendant notes that the State's theory of felony murder was based upon the two underlying felonies of rape and robbery. Defendant argues that the State's argument both injected a third underlying felony and also proposed an aggravating circumstance that carried over to the sentencing proceeding. However, the reference was to Sanderlin only. Neither Sanderlin nor defendant was charged with burglary, and the trial court did not instruct the jury to consider burglary as an aggravating circumstance. Defendant has failed to show that this comment was fundamentally unfair or affected the outcome of the trial. Therefore, the trial court did not err in failing to intervene *ex mero motu.*

**[21]** As to these jury arguments by the State, defendant also makes the alternative contention that trial counsel's failure to raise timely objections deprived defendant of effective assistance of counsel. To make a successful ineffective assistance of counsel claim, a defendant must show that (1) defense counsel's "performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984); *accord State v. Wilkerson*, 363 N.C. 382, 413, 683 S.E.2d 174, 193 (2009), *cert. denied,* —— U.S. ——, 176 L. Ed. 2d 734 (2010). Counsel's performance is deficient when it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693. Deficient performance prejudices a defendant when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 80 L. Ed. 2d at 698; *see also Wilkerson*, 363 N.C. at 413, 683 S.E.2d at 193. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698. However, even assuming *arguendo* that trial counsel was deficient in failing to object during closing arguments, we do not find defendant was prejudiced as a result. The evidence against him was overwhelming and there was no probability that the outcome was affected by the improprieties in the prosecutor's argument.

**[22]** Defendant also asserts that the State improperly argued motive by suggesting that defendant and Sanderlin killed the victim to eliminate her as a witness. Although defendant cites *State v. Williams*, 317 N.C. at 481-83, 346 S.E.2d at 410-11, that case is distinguishable. In *Williams*, the defendant had been tried capitally once before, and we had vacated defendant's sentence and remanded for a new sentencing proceeding because the trial court erroneously submitted the (e)(4) aggravating circumstance, that the capital felony was committed for the purpose of avoiding or preventing an unlawful arrest. *Id.* at 479-80, 346 S.E.2d at 409. At the defendant's second capital sentencing proceeding, the trial court correctly refrained from submitting the (e)(4) circumstance. *Id.* at 480, 346 S.E.2d at 409. Despite the prior reversal, and even though the State had presented no evidence of such a motive, the State nevertheless argued that the defendant killed the victim to silence her. *Id.* at 480-81, 346 S.E.2d at 409-10. We found this argument grossly improper. *Id.* at 483, 346 S.E.2d at 410-11. In contrast, the argument here was made during the guilt portion of the trial, was a reasonable extrapolation of the evidence, and was made in the context of the prosecutor's explanation of premeditation

and deliberation. Accordingly, this statement was not grossly improper, and the trial court did not err in failing to intervene *ex mero motu*.

[23] In his final argument relating to the guilt-innocence portion of his trial, defendant contends that the court improperly instructed the jury on acting in concert. Defendant submitted in writing the proposed instruction: "[Y]ou must be convinced, beyond a reasonable doubt, that the defendant had the intent to commit robbery with a dangerous weapon or rape at the time the victim was killed." Defendant also argued to the trial court that it would be improper to instruct in a manner indicating that Sanderlin's intent to commit those offenses was imposed on defendant. Thus, the crux of defendant's contention is that the State should have been obligated to prove that defendant himself had the requisite intent.

The trial court denied defendant's request and instructed the jury:

There is a principle in our law known as acting in concert. For a person to be guilty of a crime, it is not necessary that he himself do all of the acts necessary to constitute the crime. If two or more persons act together, with a common purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal, if the other commits that particular crime, but he is also guilty of any other crime committed by the other, in pursuance of the common purpose, or as a natural or probable consequence of the common purpose.

The trial court then defined the elements of first-degree murder based upon premeditation and deliberation:

First, that the defendant, or someone with whom he was acting in concert, intentionally and with malice killed the victim with a deadly weapon. . . .

If the State proves, beyond a reasonable doubt, that the defendant, or someone with whom he was acting in concert, intentionally killed the victim with a deadly weapon, or intentionally inflicted a wound upon the victim with a deadly weapon that proximately caused his death, you may infer first, that the killing was unlawful; and second, that it was done with malice, but you're not compelled to do so.

. . . .

Fourth, that the defendant, or someone with whom he was acting in concert, acted after premeditation, that is that he formed the intent to kill the victim over some period of time, however short, before he acted.

The trial court gave similar acting-in-concert instructions as to felony murder based upon rape and upon robbery.

Defendant argues that these instructions did not require the jury to find that defendant had the necessary intent and allowed the jury to convict defendant on the basis of Sanderlin's intent. In *State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998), this Court, in approving instructions virtually identical to the instructions provided in the case at bar, gave the following "correct statement" of the doctrine of acting in concert:

"[I]f 'two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof.' "

*Id.* at 233, 481 S.E.2d at 71 (quoting *State v. Westbrook*, 279 N.C. 18, 41-42, 181 S.E.2d 572, 586 (1971) (alterations in original), *death sentence vacated*, 408 U.S. 939, 33 L. Ed. 2d 761 (1972)). Although defendant argues that we should apply *State v. Blankenship*, 337 N.C. 543, 447 S.E.2d 727 (1994), *Barnes* explicitly overruled *Blankenship*. *Barnes*, 345 N.C. at 230, 481 S.E.2d at 69. Accordingly, the trial court's instructions relating to intent were proper.

## SENTENCING PROCEEDING

[24] We now turn to issues pertaining to sentencing. Defendant argues that the trial court committed plain error in failing to intervene *ex mero motu* during the State's opening statement in the sentencing proceeding. The State's brief opening remarks, quoted in their entirety, read:

Yesterday, you labelled the defendant a murderer. The defendant murdered Lauren Redman.

At this point in the proceedings, you're going to stop hearing much about Lauren Redman. Transition into the penalty phase, you're going to start hearing about the defendant.

The victim and the victim's loved ones will not be heard from at this point. Certainly her parents have already been sentenced to grieve themselves to their own graves haunted by the memory of that little girl they loved so much.

Now, you have to decide what will be the punishment for Lauren's killer. Thank you.

Defendant claims that this statement inflamed the passions of the jury, misled the jury into believing the State could not present evidence at sentencing, and indicated that the victim's loved ones could not be heard.

The control of opening statements rests in the discretion of the trial court. *See State v. Gibbs*, 335 N.C. 1, 40, 436 S.E.2d 321, 343 (1993), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881 (1994). "[T]he proper function of an opening statement is to allow the party to inform the court and jury of the nature of his case and the evidence he plans to offer in support of it." *State v. Paige*, 316 N.C. 630, 648, 343 S.E.2d 848, 859 (1986) (citation and internal quotation marks omitted). Because defendant did not object, we review opening statements to determine whether they were so grossly improper that the trial court abused its discretion by not intervening *ex mero motu*. *State v. Gladden*, 315 N.C. 398, 417, 340 S.E.2d 673, 685, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986).

The alleged errors in the statement must be examined in the context of defendant's own opening statements. *Id.* at 423, 340 S.E.2d at 689. The prosecutor's statement, to the effect that the jury would stop hearing about the victim and begin hearing about defendant, was consistent with defendant's opening statement at the beginning of the guilt-innocence portion of the trial when defense counsel advised the jury that it would first "hear the story of how this young woman died" and then at a later point it would hear defendant's story. The State's opening statement in the sentencing proceeding echoed defendant's earlier guilt-innocence opening statement and accurately described the shift in focus that would take place.

The State briefly mentioned that the victim's loved ones would not be heard from again. Although defendant claims that these statements evince the prosecutor's intent "solely to inflame the passions of the jury," the statement described the nature of the proceeding and provided the jury a forecast of what to expect. *See Paige*, 316 N.C. at 648, 343 S.E.2d at 859. Moreover, brief references to victims or their families in closing arguments are not grossly improper. *See State v.*

*Haselden,* 357 N.C. 1, 20-21, 577 S.E.2d 594, 607 (stating a prosecutor may remind the jury that it should also consider the life of the victim), *cert. denied,* 540 U.S. 988, 157 L. Ed. 2d 382 (2003); *State v. Moseley,* 338 N.C. 1, 50, 449 S.E.2d 412, 442 (1994) (brief references to victims or their families determined not grossly improper), *cert. denied,* 514 U.S. 1091, 131 L. Ed. 2d 738 (1995). Here we do not find the prosecutor's references to the victim and her family improper, much less grossly so, when the statement is an otherwise correct summary for the jury of the nature of the penalty proceeding and forecast of the evidence to be put forth. *See Paige,* 316 N.C. at 648, 343 S.E.2d at 859.

[25] Defendant also claims ineffective assistance of counsel because trial counsel failed to object to this opening statement. Because the opening statement was not improper, defendant's counsel was not ineffective for failing to object.

[26] We now turn to defendant's assignments of error with respect to the State's cross-examination of Dr. James Hilkey, who testified as an expert on defendant's behalf during the sentencing proceeding. First, we address defendant's argument that the trial court erred when it overruled defendant's objection to a question asked by the State. Defendant contends that the State's cross-examination mischaracterized Dr. Hilkey's test results while attempting to induce Dr. Hilkey to admit defendant malingered.

In his direct examination, Dr. Hilkey testified that defendant suffers from attention deficit hyperactivity disorder and he provisionally diagnosed a cognitive disorder. In addition, Dr. Hilkey found features of a schizotypal personality disorder along with dependent personality disorder. In Dr. Hilkey's opinion, defendant's "behavior at the time of this alleged crime would . . . not have happened, had it not been for the influence of Mr. Sanderlin and his associates."

On cross-examination, the prosecutor asked if safeguards were in place to detect malingering and ensure accurate results. Dr. Hilkey responded that the results of defendant's memory malingering "TOMM" test did not indicate malingering. When the prosecutor asked why Dr. Hilkey had not used a score sheet for this particular exam and whether the failure to use such a sheet was ethical, Dr. Hilkey answered that he recorded defendant's answers "honestly" using a notepad and that his scoring method was neither "unusual" nor "unethical." The prosecutor then asked about another test known as the Milner Forensic Assessment of Symptoms, and Dr. Hilkey gave

his opinion that defendant's score on this test was not indicative of malingering for psychological symptoms.

The prosecutor then turned to a third test, the Millon Clinical Multiaxial Inventory (MCMI). Dr. Hilkey testified that he had invalidated this test because of defendant's report of an excessive number of symptoms. The prosecutor then noted that Dr. Hilkey did not print out the results of this test, and Dr. Hilkey replied, "It was an invalid test. The . . . information generated would not be of use to me." The prosecutor next asked, "Would it be of use to anybody to see what type of malingering answers that Byron Waring provided on that test to print out that sheet[?]" The trial court overruled defendant's objection, and Dr. Hilkey responded that doing so would not have been useful to him, but that the raw scores were available from which anyone could generate defendant's profile. He gave three potential reasons for invalidation of the test results: failure to comprehend the test sufficiently, extreme psychological vulnerability and an attempt to draw attention to his condition, and overt malingering. Dr. Hilkey added that he believed defendant's test was invalid for the second reason.

The significance of this cross-examination of Dr. Hilkey emerged during the prosecutor's subsequent questioning of Dr. Mark Hazelrigg, an expert forensic psychologist who was presented by the State as a rebuttal witness. Dr. Hazelrigg disagreed with Dr. Hilkey as to the question of defendant's malingering. With regard to the MCMI test result that Dr. Hilkey determined to be invalid, Dr. Hazelrigg noted that the results were internally inconsistent because "[defendant] reported having symptoms in virtually every category at a fairly high level," yielding results that were logically and medically incompatible. Dr. Hazelrigg interpreted defendant's over-reporting of symptoms as either "malingering or begging for help." Although "that's sort of a subjective judgment about which one," Dr. Hazelrigg's opinion was that defendant was exaggerating his symptoms rather than asking for help.

Because the experts disagreed on the extent, if any, of defendant's purported malingering, defendant's mental capacity and possible neurological and psychological disorders were key issues contested at sentencing. "The scope of cross-examination is governed by the sound discretion of the trial court and the requirement that the questions be asked in good faith." *State v. Fleming,* 350 N.C. 109, 139, 512 S.E.2d 720, 740 (citation omitted), *cert. denied,* 528 U.S. 941, 145 L. Ed. 2d 274 (1999). The prosecutor's question appropriately sought

to elicit a concession from Dr. Hilkey that other experts might disagree with his opinions on this pertinent evidence. *See State v. Hipps*, 348 N.C. 377, 409, 501 S.E.2d 625, 644 (1998) (concluding that prosecutor's questions "designed to elicit that another conclusion could be drawn from the facts" were "well within the bounds of proper cross-examination of an expert witness"), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 114 (1999). Nothing in the record indicates this questioning was conducted in bad faith, nor do we see any indication that the trial court abused its discretion in overruling defendant's objection.

[27] Next, we address defendant's argument that the trial court erred when it failed to intervene *ex mero motu*, first, when the State purportedly accused Dr. Hilkey of unethical conduct and later, when the State asked Dr. Hilkey about defendant's potential for future violence. When a defendant fails to object to a cross-examination question, but later contests the question on appeal, we review for plain error only. *See State v. Locklear*, 349 N.C. 118, 156, 505 S.E.2d 277, 299 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). "In criminal cases, a question which was not preserved by objection . . . nevertheless may be made the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(c)(4) (2009).[3] Defendant has not "specifically and distinctly" assigned plain error as to these issues and has thus failed to preserve them on appeal.

Even so, mindful that this case is capital, we have reviewed these issues and find them to be without merit. As to Dr. Hilkey's ethics, the record provides no basis for the prosecutor's cross-examination question to Dr. Hilkey asking whether he was ethically obligated to record some of defendant's test results on a score sheet, other perhaps than Dr. Hazelrigg's statement that "it really isn't possible to test without the scoring sheet and the materials." At any rate, Dr. Hilkey gave a full and appropriate response to the question, which the prosecutor accepted at face value. As to defendant's purported potential for future violence, the prosecutor asked Dr. Hilkey only: "And within the scales, the printout [from defendant's testing] gives you scales. The defendant was very elevated . . . in the scale for violence potential, is

---

3. Rule 10 of the Rules of Appellate Procedure was recently amended to eliminate assignments of error on appeal. However, the amended rule "appli[es] to all cases appealed on or after [1 October 2009]." N.C. R. App. P. 10 (2010). Because notice of appeal in the instant case was entered on 9 July 2007, we analyze this case under the version of Rule 10 applicable at that time.

STATE v. WARING

[364 N.C. 443 (2010)]

that accurate?" The import of this question is ambiguous and could refer to defendant's past violent acts as well as any tendency toward the future. No evidence suggests that the question was asked in bad faith. Accordingly, the trial court did not err by failing to intervene *ex mero motu* as to either question.

In the alternative, defendant contends that trial counsel failed to provide effective assistance by failing to object to these questions. Because the record has not been developed on this issue, we dismiss these assignments of error without prejudice to raise them during post-conviction proceedings. *See Fair*, 354 N.C. at 167, 557 S.E.2d at 525.

[28] In an argument related to evidence presented about defendant's intelligence, defendant contends that the trial court erred in sustaining the State's objection when defendant sought to introduce opinion evidence of his actual intelligence quotient. Defendant called as a witness Ms. Harriet Borom, a special education teacher who had met defendant when he was eleven years old. She testified that he fell behind in his school work and became frustrated and angry. She added, without objection, that she did not believe the results of I.Q. tests taken by defendant at age eleven that placed him in the normal range. She described defendant's experiences in school and testified that an I.Q. test administered to defendant when he was in the sixth grade that yielded a score of 89 "ha[d] no foundation in reality." She added that he presented the traits of a person who is mentally handicapped. However, when Ms. Borom volunteered, "If I had to take a stab at it, and just from my working with [defendant], if I had to guess, I would say his I.Q. was somewhere in the neighborhood of the high seventies—I mean high—neighborhood of the high—mid to high sixties," the State successfully objected. Defendant argues that this testimony was admissible lay opinion testimony. However, the witness was allowed to offer her opinion that defendant suffered from a "lower I.Q.," and the State objected only when she gave an opinion about a specific score range. Because the witness had not been tendered as an expert and was admittedly guessing, her speculation as to a specific range of scores was inadmissible. *Compare State v. Fullwood*, 323 N.C. 371, 385, 373 S.E.2d 518, 527 (1988) (concluding that an expert's characterizing his opinion as a "guess" does not render the opinion inadmissible when the term implies uncertainty instead of "mere conjecture or speculation"), *judgment vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990). The objection was properly sustained.

[29] Defendant next argues that the trial court abused its discretion by failing to intervene *ex mero motu* during the prosecutor's closing argument in the sentencing proceeding. Defendant claims that the prosecutor incorrectly advised the jury that the same evidence could be used to find more than one aggravating circumstance. In the State's closing arguments, the prosecutor discussed the facts of the case, then turned to the issue of punishment, explicitly foreshadowing the instructions that the trial court would later provide. The prosecutor informed the jury that it would consider three separate aggravating circumstances: that the murder was committed while defendant was engaged in the commission of a rape (N.C.G.S. § 15A-2000(e)(5)); that the murder was committed for pecuniary gain (N.C.G.S. § 15A-2000(e)(6)); and that the murder was especially heinous, atrocious, or cruel (N.C.G.S. § 15A-2000(e)(9)). The prosecutor's initial description of the (e)(5) and (e)(6) circumstances was short and straightforward. However, when the prosecutor turned to the (e)(9) circumstance, he supported his contention that the victim's ordeal and knowledge of her impending death justified a finding of this circumstance by playing for the jury a tape recording of defendant's confession to the crime, during which defendant said:

"I moved back beside her, . . . and he told me to finish her. I got on my knees, I picked up the knife. . . . I had the knife again in my sleeves, my hands in my sleeves again holding the knife. I looked at her and then she looked at me and she said, 'please don't kill me.' She said she was about to die anyway. The last words she said to me was, 'can I please get some water.' And I said, 'no.' . . . and I walked out."

The prosecutor argued that the victim did not die "a quick and painless death," but continued to suffer, and that her last moments awaiting death would have, for her, seemed "an eternity."

After discussing these three aggravating circumstances individually, the prosecutor addressed them together:

Collectively, these three aggravating circumstances, a rape, pecuniary gain, especially heinous, atrocious and cruel, provide the following context of some important factors for you to consider.

Number one, victimized in home at night, that distinguishes other killings. Defendant Byron Waring's consent was by fraud, lied to her to get inside the house. Then he assisted codefend-

ant Joseph Sanderlin in his burglary, breaking and entering at night with intent to commit a felony. Victimized in one's own home at night.

Two, not just one, but two attackers, two men. It's very important, strength in numbers. That sets this case apart from others.

Three, a blameless victim. Young, her whole life ahead of her. Certainly confused why this was happening to her. There really is no explanation on the facts of this case.

Four, standing alone by itself is an overwhelming circumstance in this case. The actual rape. Rape, nonetheless, on her own living room floor, face down. This defendant choking her, holding her down on her back while Joseph Sanderlin is raping her. One of these exhibits has the trauma Dr. Gardner pointed out that she found to her vagina, not to be expected.

Five, Lauren Redman was taped. She was tortured, taped up and tortured. Tortured physically, tortured psychologically. Recall the seventeen knife flecks, give me what—here it is, going to give me what I want, going to give me what I want. Just torture. Physically knowing this has happened to you psychologically and the after[e]ffects. And what are the after[e]ffects of this point from the facts?

Number six, the defendant decides to start punching her in the face and stomping her on the face, after she'd been raped.

Number seven, keep in mind, I have one to show you, but there were two knives involved, two knives. Whichever way she turned, whichever way she was flipping, there was a knife to defend against. Two knives, the number, the severity of the stab wounds.

Recall Dr. Gardner's testimony. I think if you added [it] up you have—on top of the seventeen flecks, you have the twenty-three stab wounds to the torso, five to the head and neck, and the two actual cuttings. Thirty wounds, thirty stab and cutting wounds, seventeen flecks, forty-seven wounds.

The level of other violence in this case can be distinguished from other ordinary murders. This is not to be expected. This is especially heinous, atrocious and cruel.

Number eight, pecuniary gain, robbed for money, robbed for money. While Mr. Pipkin is making a 911 call, you don't know the timeframe, is the defendant using the twenty dollars that he got from Ms. Redman's wallet to buy cigarettes about that time? Human life reduced to money. It's particularly contemptible, particularly contemptible. That distinguishes this murder from others.

Finally, prolonged conscious suffering. As I depicted to you, from being attacked in her living room for however long that lasted, make it most conservative short time by her perception, how long was that?

After her attackers leave, she's still fighting and willing to live. She gets outside and goes on to apartment B, Andy Pipkin and the 911 call. She dies at the end of that 911 call, all the evidence shows to you that. Officer David Naumuk, when he gets there doesn't see a sign. EMS gets there on his heels, and she's dead, placed in the ambulance.

Lauren was tortured, absolutely tortured. The 911 call, as she told Andy Pipkin on that call, you can hear it, it's tough, your stomach hurts. I remember asking Mr. Pipkin on the stand, what was she doing while you were on the phone with 911, his response was, "just trying not to bleed to death." That speaks for itself.

Individually, these aggravating circumstances are weighty, important, substantial. Collectively, they cannot be defeated. They just can't.

Defendant argues that the trial court committed plain error by failing to intervene because, defendant contends, the State improperly argued that the jury could use the same evidence to find the (e)(9) aggravating circumstance (murder especially heinous, atrocious, or cruel) that it would also use to find the (e)(5) aggravating circumstance (murder committed during commission of the felony of rape) and the (e)(6) aggravating circumstance (murder committed for pecuniary gain).

"In a capital case the trial court may not submit multiple aggravating circumstances supported by the same evidence." *State v. Lawrence*, 352 N.C. 1, 29, 530 S.E.2d 807, 825 (2000) (citation omitted), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001). However, while the submission of two aggravating circumstances based upon

the same evidence is impermissible "double counting," *State v. Kandies*, 342 N.C. 419, 450, 467 S.E.2d 67, 84, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996), *judgment vacated on other grounds*, 545 U.S. 1137, 162 L. Ed. 2d 884 (2005), "[a]ggravating circumstances are not considered redundant absent a complete overlap in the evidence supporting them," *State v. Moseley*, 338 N.C. at 54, 449 S.E.2d at 444 (citations omitted).

A review of the State's argument indicates that the prosecutor did not ask the jury to double count. Although defendant contends that the above-quoted argument pertained only to the (e)(9) aggravating circumstance, the prosecutor at the outset of this portion of his argument advised jurors they would be considering three aggravating circumstances that would be submitted to them. The prosecutor then set out nine aspects of the case to support those three aggravating circumstances. The fourth aspect that was argued related to the rape, supporting (e)(5). The eighth aspect that was argued related to pecuniary gain, supporting (e)(6). Several other aspects related to the violence inflicted on the victim, supporting (e)(9). The prosecutor closed by saying that each of the statutory aggravating circumstances was, by itself, "weighty, important, [and] substantial" and that the three together "cannot be defeated."

Thus, the argument distinguished the three aggravating circumstances and the evidence supporting each. A similar closing argument was made in *State v. Miller*, 357 N.C. 583, 596-97, 588 S.E.2d 857, 867 (2003), *cert. denied*, 542 U.S. 941, 159 L. Ed. 2d 819 (2004), in which this Court considered whether the State's (e)(9) argument was proper when the prosecutor asked the jury to imagine the victim's feelings during a kidnapping that was also the factual basis for a separate (e)(5) aggravating circumstance. We noted that, while there was "some overlap" between the (e)(9) and (e)(5) aggravating circumstances in that case, "separate and distinct evidence exist[ed]" for each circumstance, and the prosecutor's exhortation to the jury to consider the victim's thoughts during the kidnapping "was not a request for the jury to consider the exact same evidence to find aggravating circumstances (e)(5) and (e)(9)." *Id.* at 597, 588 S.E.2d at 867.

Here, as in *Miller*, there was substantial "separate and distinct evidence" for the (e)(5), (e)(6), and (e)(9) aggravating circumstances. Because the prosecutor's argument was proper, the trial court had no reason to intervene. In addition, defendant's contention that trial counsel's neglect to object to this argument constituted

ineffective assistance fails because counsel had no basis for raising an objection.

**[30]** Defendant contends that the trial court committed plain error by failing to instruct the jury that the same evidence could not be used to support the existence of more than one aggravating circum-stance. We have held that a defendant seeking such an instruction must make a request to the trial court. *State v. Roache*, 358 N.C. 243, 325-26, 595 S.E.2d 381, 433 (2004). No timely request was made here. Because the trial court was under no duty to give such an instruction in the absence of a request, plain error review is not available to defendant. *Cf.*, *State v. Peterson*, 350 N.C. 518, 529, 516 S.E.2d 131, 138 (1999) (no plain error review conducted when trial court found not to have a duty to give a peremptory instruction), *cert. denied*, 528 U.S. 1164, 145 L. Ed. 2d 1087 (2000).

In the alternative, defendant argues ineffective assistance of counsel for trial counsel's failure to request such an instruction. Because the record is undeveloped as to the reasons why no such request was made, we dismiss this issue without prejudice to defend-ant to raise it in post-conviction proceedings. *See Fair*, 354 N.C. at 167, 557 S.E.2d at 525.

**[31]** Defendant next contends that the trial court plainly erred in fail-ing to prevent the State from making grossly improper closing argu-ments during the sentencing proceeding. In this line of argument, defendant first asserts that the prosecutor improperly injected his personal beliefs on three occasions when he used the words "I think" or "I believe" while commenting on the mitigating circum-stances presented by defendant. In discussing the (f)(6) statutory mitigating circumstance, the State argued:

> I think anyone that can take the roll of packaging tape over to her apartment, do what you do, leave, discard the evidence, recog-nize and tell Joey, "we have blood on our clothes," take a shower, throw away the clothes, . . . we never got the clothes, get rid of this car, get rid of the knife, get rid of the property, and then when the officers arrive at your house, initially denying any involve-ment in this.
>
> And when you grab this knife during the course of commit-ting the murder, you're using the shirt sleeve to avoid finger-prints, I think you can appreciate the criminality of your conduct.

Then, in addressing the statutory (f)(8) mitigating circumstance, the prosecutor argued:

> But as to "the defendant aided in the apprehension of another capital felon," I think the evidence is the defendant is at [the Raleigh Police Department], obviously the initial denial of what he did.

Finally, in summarizing his view of the defense mitigation case, the prosecutor referred to the testimony of various lay witnesses who had spoken about the hardships defendant faced in his youth:

> The essence of what I believe is that the defendant had numerous people that tried the best they could to no avail, and that he suffered from academic problems. That describes a lot of people.

As a general rule, it is improper for an attorney to inject his or her personal beliefs into a closing argument. "During a closing argument to the jury an attorney may not . . . express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant . . . ." N.C.G.S. § 15A-1230(a). While prosecutors are permitted to argue as to "the circumstances of the murder and whether these circumstances warrant imposition of the death penalty," *see, e.g., Haselden,* 357 N.C. at 25, 577 S.E.2d at 609, they may not " 'inject [their] personal experiences, [their] views and [their] opinions into the argument before the jury,' " *State v. Jones,* 355 N.C. 117, 130, 558 S.E.2d 97, 105 (2002) (citation omitted).

Although the State argues that the words "I think" and "I believe" were used merely to introduce permissible arguments regarding the facts and characteristics of this murder, we have no doubt that the prosecutor crossed the line when he shared with the jury "[t]he essence of what I believe." While the phrases "I think" and "I believe" often are no more than verbal padding in oral argument, they can, as happened here, bleed over into a violation of N.C.G.S. § 15A-1230 and should be avoided when a party is seeking directly to persuade a jury.

Nevertheless, while the prosecutor's argument contained improper material, our review of the record satisfies us that his comments were a far cry from the type of inflammatory argument we condemned in *Jones. Id.* at 132-34, 558 S.E.2d at 106-08 (finding error when prosecutor made a "thinly veiled attempt" to compare the defendant's acts to the killing of students at Columbine High School and the bombing of the federal courthouse in Oklahoma City, then

argued that the defendant was "lower than the dirt on a snake's belly"). The argument here did not trigger an objection and was not so grossly improper as to require the trial court to intervene *ex mero motu*. Therefore, the trial court did not err in failing to intervene *ex mero motu*.

[32] In his second related argument, defendant claims "the State openly mocked and laughed at Dr. Fozdar's opinions after (wrongly) implying that Dr. Hilkey had doubted Dr. Fozdar's diagnosis" when the prosecutor argued during the sentencing proceeding:

> Is [Dr. Hilkey's] bright line of Dr. Fozdar's confident opinion, beyond a reasonable doubt, laugh, laugh. I don't know. These are things for you to consider.

While this statement, standing alone, is somewhat opaque, a review of the context reveals that the comment was part of the prosecutor's discussion of defendant's experts' opinions, which the prosecutor suggested were inconsistent and ill-founded.

" 'When the prosecutor becomes abusive, injects his personal views and opinions into the argument before the jury, he violates the rules of fair debate . . . .' " *Id.* at 130, 558 S.E.2d at 105 (quoting *State v. Smith*, 279 N.C. 163, 166, 181 S.E.2d 458, 460 (1971)). However, "it is not improper for the prosecutor to impeach the credibility of an expert during his closing argument." *State v. Roache*, 358 N.C. at 300, 595 S.E.2d at 417 (citation and internal quotation marks omitted). The prosecutor here was impeaching the credibility of an expert witness during closing arguments. While the phrase "laugh, laugh" may well have been meant to ridicule the defense experts, these words are ambiguous and confusing in context and did not trigger an objection. This argument was not so grossly improper as to require the court to· intervene *ex mero motu*.

[33] In his third related argument, defendant contends the prosecutor argued outside the record and attempted to inflame the jury with an unfairly prejudicial argument about "clearly irrelevant evidence." Defendant refers to two portions of the State's closing argument relating to aggravating circumstances. While discussing the (e)(9) aggravating circumstance, the prosecutor described how the victim, after being raped and stabbed, dragged herself to a neighboring apartment. The prosecutor then described how Pipkin had tried to help:

> Certainly Andy Pipkin did the best he could. Decent guy, stranger, trying to help out. I told you he'd never knew her, certainly will never forget her. He's been affected, you can tell by his

testimony, his demeanor. He told you he never returned to sleep another night at that apartment.

He called 911. He applied the towel to Ms. Redman. I suspect if he didn't, the blood outside on State's [Exhibit] 87 will be a lot more. I don't know how you can get a lot more, that's a lot of blood, but that's what [sic] the towel covering your open wound.

You heard [the] 911 tape. You heard the interaction going on between Mr. Pipkin, who I suspect, I assume was shell-shocked with Ms. Redman. It's not like the movies, it's not like the movies.

Defendant contends that the State improperly argued that the effect of the crime on Pipkin justified the (e)(9) aggravating circumstance. However, this Court has found not improper an argument offered in support of the (e)(9) circumstance stating that the victim's survivors were present at the time of her death and "even attempted to stop [the] defendant from killing her." *State v. Fisher*, 336 N.C. 684, 699-700, 445 S.E.2d 866, 874-75 (1994), *cert. denied*, 513 U.S. 1098, 130 L. Ed. 2d 665 (1995). Here, as in *Fisher*, the prosecutor used Pipkin's experience as a means of conveying the victim's suffering and the heinous, atrocious, or cruel nature of the crime. Thus, this portion of the State's closing argument was not improper.

**[34]** Defendant next complains about the prosecutor's description, presented at the end of his argument on aggravating circumstances, of "a highly emotional—and completely imagined—conversation with [victim] Lauren Redman's father":

When a father hears a daughter has been murdered, what does he ask? What's the first thing does he want to know? Did she suffer? Did she suffer? And then after that, I suspect what's the next question? You fumble for the word, was she, you know, abuse—was she raped? The answer on these facts to both of those, Mr. Redman, are yes, she suffered, and she was raped.

Defendant contends that this argument improperly strays outside the record.

In a closing argument in a criminal trial, "an attorney may not . . . make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice." N.C.G.S. § 15A-1230(a). However, this Court has also observed that "hypothetical examples, by their very nature, are fictional and do not purport to contain facts of record or otherwise." *State v. Chapman*,

359 N.C. 328, 372, 611 S.E.2d 794, 826 (2005). "Thus, it is unlikely that jurors were misled . . . ." *Id.*; *see also State v. Moseley*, 338 N.C. at 49-50, 449 S.E.2d at 441 (concluding that the argument, "You don't think this woman wouldn't have been loving to a child if he had given her a chance to have one?," was not "so egregious as to require intervention by the trial court *ex mero motu*").

The prosecutor never indicated that such a conversation had occurred. In context, this argument was another permissible reminder from a different perspective of how the victim had suffered and the nature of defendant's actions. *See State v. Tyler*, 346 N.C. 187, 206, 485 S.E.2d 599, 609 (speculation about what would have happened if a child had walked into his mother's murder scene held not grossly improper), *cert. denied*, 522 U.S. 1001, 139 L. Ed. 2d 411 (1997). This argument was not so grossly improper as to require the trial court to intervene *ex mero motu*.

[35] Defendant also contends that the State improperly accused defendant of being "a principal in a street gang" and asserted that the victim's death "was in fact a gang killing":

> [Defendant] comes to live with [his mother]. Was that the best thing? Who knows. But he comes to live with her, and at some point, he asserts himself. He starts making his own decisions. He starts running wild, the gang life. This culminates in November 8th, 2005 of the death of Lauren Redman.

Defendant argues that the "record was devoid of any evidence that [d]efendant was actually involved in any significant way in a street gang."

As noted above, in a closing argument in a criminal trial, "an attorney may not . . . make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice." N.C.G.S. § 15A-1230(a). " 'Counsel may, however, argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom.' " *Wilkerson*, 363 N.C. at 423, 683 S.E.2d at 199 (quoting *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709-10 (1995), *cert. denied*, 516 U.S. 1148, 134 L. Ed. 2d 100 (1996)). The prosecutor did not argue that defendant had any significant involvement in a gang or that the killing was gang-related. The term "gang life" is shorthand for a lawless and unrestrained existence. Even so, defendant himself admitted to Dr. Hazelrigg that he had been involved in a gang for about three years. In addition, trial evidence indicated that defendant had been suspended from school

for his involvement in a snowball fight between the Bloods and an Hispanic gang. While the record is ambiguous as to whether defendant himself had flashed gang signs during the altercation, such signs were used by participants in the melee. Other evidence indicated that codefendant Sanderlin had been charged with recruiting potential members to join a gang. Thus, the prosecutor's statements were supported by evidence in the record and were not improper.

[36] In his final contention relating to the prosecutor's closing argument, defendant asserts that the prosecutor committed a gross impropriety when he argued that defense counsels' entire mitigation case was a "lie" based on "half-truths" and omitted information. The State argued that the defense had made defendant's mother the "fall guy" and that her failure to testify was deliberate because the defense did not want the jury to hear from her. The prosecutor summed up with the "[o]ld saying, a lie can travel halfway around the world while the truth is still putting on its shoes." While the prosecutor then qualified his argument by adding, "I'm not for a moment suggesting anyone in the world has intentionally deceived this jury, that's not what I'm suggesting," he subsequently reintroduced the theme that the defense had presented an incomplete picture: ·

> And then [defendant's] grandfather told you, he wanted to come back to Raleigh, the big city and all that entails. These are his decisions. Homeless by design.

> Again, half the truth equals a whole lie. Consider the fuller presentation of all the evidence.

As detailed above, counsel may argue the facts admitted into evidence as well as any reasonable inference that can be drawn therefrom. *Wilkerson*, 363 N.C. at 423, 683 S.E.2d at 199. Arguments against a defendant's mitigating circumstances are not an improper denigration of mitigating evidence, but constitute legitimate argument on the weight of that evidence. *State v. Robinson*, 336 N.C. 78, 129, 443 S.E.2d 306, 332 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). However, we have also held that calling a witness or opposing counsel a liar when no evidence supports the epithet is a gross impropriety. *State v. Rogers*, 355 N.C. 420, 462-63, 562 S.E.2d 859, 885 (2002).

A closing argument is to be considered as a whole. *See Moseley*, 338 N.C. at 50, 449 S.E.2d at 442 (noting that a prosecutor's arguments are not to be reviewed in isolation and consideration must be

given to the context of the remarks and to the overall factual circumstances). At this point in his argument, the prosecutor's theme was that defendant's mitigating evidence failed to present a complete picture. Although defendant's mother had not been called to testify, at least eighteen of the sixty-eight mitigating circumstances submitted to the jury at sentencing related to defendant's mother and her deficiencies as a parent. The prosecutor acknowledged that there was evidence of abuse and neglect on her part while contending there was also evidence of her positive effort and involvement in defendant's life. Thus, the prosecutor properly asked the jury to consider the credibility of those testifying as well as the "fuller presentation of some of this proposed mitigation evidence."

Regarding defendant's homelessness, ample evidence in the record supported the prosecutor's contention that defendant was homeless "by design." Defendant never responded to an offer from his teacher to assist him with living accommodations. In 2004, the year defendant claimed homelessness, he spent no less than eighty days in jail and at least a month living at his grandparents' house. Although defendant declared he had been put out of his mother's home, interviews with family members indicated defendant did not want to follow the house rules. Accordingly, we find the prosecutor's argument appropriately drew inferences from properly admitted evidence and was not so grossly improper as to require the trial court to intervene *ex mero motu*.

[37] Defendant also asks that we find cumulative error in the prosecutor's closing argument. As discussed above, several of the prosecutor's arguments were not erroneous in any sense. The collective impact of other errors in the closing argument does not rise to the level of reversible error.

Next, we address defendant's argument that the trial court erred by refusing to give peremptory instructions on certain statutory mitigating circumstances. Specifically, during the charge conference defense counsel requested peremptory instructions on several statutory mitigating circumstances, including the following three: that "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance," pursuant to N.C.G.S. § 15A-2000(f)(2); that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," pursuant to N.C.G.S. § 15A-2000(f)(6); and that "[t]he defendant aided in the apprehension of another capital felon," pursuant to N.C.G.S. § 15A-2000(f)(8). The

trial court declined to give the requested instructions peremptorily, but did provide nonperemptory instructions on each of these mitigating circumstances. Relating to the (f)(2) mitigating circumstance, the trial court also gave peremptory instructions regarding both the nonstatutory mitigating circumstance that "Byron Waring suffers from borderline intellectual functioning," which at least one juror found, and the nonstatutory mitigating circumstance that "Byron Waring suffers from right hemisphere brain dysfunction," which no juror found. One or more jurors found the (f)(6) and (f)(8) circumstances, but no juror found the (f)(2) circumstance.

[38] We have held that a " 'trial court should, if requested, give a peremptory instruction for any mitigating circumstance, whether statutory or nonstatutory, if it is supported by uncontroverted and manifestly credible evidence.' " *Maness*, 363 N.C. at 291, 677 S.E.2d at 815 (citation omitted); *State v. Gay*, 334 N.C. 467, 492-93, 434 S.E.2d 840, 854-55 (1993). Evidence supporting the (f)(2) and (f)(6) mitigating circumstances was presented by Dr. Hilkey, a psychologist, and Dr. Fozdar, a neuropsychiatrist, who testified on defendant's behalf. Dr. Hilkey stated that at the time of the crime, defendant was suffering from a cognitive disorder and personality disorder with schizotypal and dependent features. According to Dr. Hilkey, defendant also has borderline intellectual function that limits his ability to function and solve problems. Dr. Fozdar testified that defendant suffers from a neurodevelopmental and neuropsychiatric disorder that affects the right hemisphere of his brain, which regulates behavior and judgment. Dr. Fozdar explained that, as a result of this condition, defendant has impaired judgment and insight and has difficulty processing information, especially in stressful situations. Both of these experts testified that, in their opinion, defendant was under the influence of a mental or emotional disturbance at the time he committed the crime and that he lacked the capacity to conform his conduct to the requirements of the law.

However, this evidence was not uncontested. Other evidence presented during the guilt portion of the trial, the cross-examination of defendant's experts, and the rebuttal testimony presented on behalf of the State by Dr. Hazelrigg, all contradicted defendant's experts. Dr. Fozdar's acknowledgment that defendant knows right from wrong and concession that he did not believe defendant's disorder caused him to commit murder were at least somewhat inconsistent with his assessment that defendant's mental or emotional disturbance "influenced" the murder. Also, Dr. Hazelrigg, testifying for the State, contradicted the opinions of defendant's experts and did

not find any mental disorder or dysfunction that would interfere with defendant's ability to control his behavior or understand right from wrong. *See also State v. Duke*, 360 N.C. 110, 131-32, 623 S.E.2d 11, 25 (2005) (holding that the trial court correctly refused to give the jury a peremptory instruction on the (f)(2) mitigating circumstance when an expert testified about inconsistent diagnoses of the defendant, thereby making "evidence of [the] defendant's mental or emotional disturbance . . . not uncontroverted"), *cert. denied*, 549 U.S. 855, 166 L. Ed. 2d 96 (2006).

The trial court also noted that defendant's covering his hand with his sleeve as he picked up the knife was evidence contradicting defendant's argument that he was unable to appreciate the criminality of his conduct. The trial court further found that defendant's evidence that he prayed and asked for forgiveness after the murder was inconsistent with his decision initially to lie about his involvement. *See State v. Badgett*, 361 N.C. 234, 257-58, 644 S.E.2d 206, 219-20 (holding the trial court's refusal to submit the (f)(2) mitigating circumstance was appropriate when "[t]he events before, during, and after the killing suggest[] deliberation, not the frenzied behavior of an emotionally disturbed person" and that "[i]n particular, defendant's initial lies to police about his involvement in the murder and his washing and disposal of the murder weapon are especially relevant on the (f)(6) mitigator, because they tend to show that defendant fully appreciated the criminality of his conduct" (internal quotation and citations omitted) (first alteration in original)), *cert. denied*, 552 U.S. 997, 169 L. Ed. 2d 351 (2007). Because the evidence supporting submission of the (f)(2) and (f)(6) mitigating circumstances was not uncontroverted, the trial court did not err by refusing to instruct peremptorily.

In addition, the evidence supporting submission of the (f)(8) mitigating circumstance was not uncontroverted. Although some evidence supported defendant's claim that he aided in the apprehension of Sanderlin, other evidence indicated that defendant provided several different names and identities for the other man involved in the murder, led police officers on a wild goose chase in Apex, and stated that he was not going to snitch. Accordingly, the evidence that defendant aided in the apprehension of Sanderlin was not uncontroverted and the trial court did not err when it refused to give a peremptory instruction on the (f)(8) mitigating circumstance.

**[39]** Defendant next contends the trial court erred when it instructed the jury to consider, over his objection, whether he had

"no significant history of prior criminal activity," pursuant to N.C.G.S. § 15A-2000(f)(1). Defendant argues that this circumstance was not supported by the evidence and its submission invited ridicule by the prosecutor. Defendant originally submitted the (f)(1) mitigating circumstance at the charge conference, but later moved to withdraw it. The State argued against its withdrawal, contending that the trial court had a duty to offer the circumstance when the evidence supported it. The trial court reviewed several cases along with defendant's criminal history, then concluded the evidence supported submission of the mitigating circumstance.

The statute governing capital sentencing proceedings requires that:

> In all cases in which the death penalty may be authorized, the judge shall include in his instructions to the jury that it must consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances from the lists provided in subsections (e) and (f) which may be supported by the evidence . . . .

N.C.G.S. § 15A-2000(b). In the context of the (f)(1) mitigating circumstance, although this Court has long "held that the trial court has no discretion and must submit the statutory circumstance when sufficient supporting evidence is presented," *State v. Hurst*, 360 N.C. 181, 193, 624 S.E.2d 309, 319 (citation omitted), *cert. denied*, 549 U.S. 875, 166 L. Ed. 2d 131 (2006), we have also acknowledged that this particular mitigating circumstance paradoxically can be used to a defendant's disadvantage, as defendant argues happened here, *id.* at 195-97, 624 S.E.2d at 320-22. Accordingly, we review the trial court's decision whether to submit the (f)(1) mitigating circumstance in light of the whole record. *Id.* at 197, 624 S.E.2d at 322.

In *Hurst* we acknowledged that "[o]ur trial judges are capable of making sensible assessments." *Id.* Defendant's prior criminal activity consisted of breaking and entering a motor vehicle (a Class I felony) and several misdemeanors, including misdemeanor larceny, public disturbance, defrauding an innkeeper, trespassing, carrying a concealed weapon, and possession of marijuana. There was also evidence of unspecified theft activity, mostly at school. Because the evidence related to submission of (f)(1) was limited to minor offenses, the trial court reasonably determined that a rational jury could conclude that defendant had no significant history of criminal activity.

Therefore, the trial court did not err in submitting the (f)(1) statutory mitigating circumstance.

[40] Defendant also argues that the trial court erred in failing to give peremptory instructions as to nine nonstatutory mitigating circumstances. The jury was given nonperemptory instructions on each of these circumstances, but no juror found that any of the nine circumstances existed. While we have held that a trial court's failure to give a peremptory instruction is reviewed for error that is harmless beyond a reasonable doubt, *Gay*, 334 N.C. at 494, 434 S.E.2d at 855, we also have noted the "draconian" effect of this standard of review and the practical difficulties faced by judges who may be required to recall, at the end of a lengthy trial, evidence that supports a proposed mitigating circumstance along with any evidence that may contradict it, *Barden*, 356 N.C. at 376, 572 S.E.2d at 146.

The first circumstance on which defendant argues the trial court should have given a peremptory instruction is that "Byron Waring's mother took, during her pregnancy, medicine prescribed for her brother, became ill, and did not seek medical attention." The pertinent evidence indicates that defendant's grandmother testified that, while pregnant, defendant's mother took a "high power medicine" that had been prescribed for her brother's bronchitis. The medicine is not otherwise identified, and the only stated effect on defendant's mother was that it made her "act different" and "shake." It is not clear to us from the record how this evidence was mitigating or that the evidence was manifestly credible. Accordingly, the trial court did not err in failing to instruct peremptorily.

Next, defendant argues that the trial court erred in failing to instruct peremptorily on the nonstatutory mitigating circumstance that "Byron Waring needed special education services in elementary school but was mainstreamed and placed in an academic environment where the expectations exceeded his ability to perform." However, evidence was presented that defendant was tested before entering kindergarten and placed in a special class. As a result, that mitigating circumstance was not supported by uncontradicted evidence.

The next circumstance was that "Byron Waring had a negative self image at an early age." Because testimony was presented that defendant was an active and happy child, the evidence supporting this circumstance was not uncontradicted. This same evidence contradicted the mitigating circumstance that "Byron Waring began having chronic feelings of inadequacy and rejection at an early age."

**[41]** Defendant argues that peremptory instructions should have been given on a related group of circumstances regarding his mother: "Byron Waring's mother did not accept his cognitive impairment and intellectual deficits"; "Byron Waring's mother consistently sabotaged his ability to obtain psychiatric treatment"; "Byron Waring's mother consistently sabotaged his ability to obtain necessary mental health treatment"; "Byron Waring's mother would not allow him to take medications for his mental disabilities"; and "Byron Waring was repeatedly rejected by his mother throughout his life." Because defendant's mother did not testify, she appears to us only as projected by others. After a careful review of the evidence and the arguments made by defendant and the State, we conclude that the trial court erred in failing to instruct peremptorily that defendant's mother did not accept his deficits. The evidence regarding the other circumstances was controverted, and thus, no peremptory instruction was needed.

However, in light of the fact that several of the mitigating circumstances submitted by defendant relating to his mother were virtually identical in effect, the fact that peremptory instructions were given as to three other mitigating circumstances relating to defendant's mother, the fact that the jury failed to find mitigating effect as to those circumstances relating to defendant's mother where the court gave a peremptory instruction, and the fact that the jury failed to find seventeen of the nineteen non-statutory mitigating circumstances where the court gave a peremptory instruction, we conclude that the trial court's error in failing to give this particular instruction peremptorily was harmless beyond a reasonable doubt.

## PRESERVATION ISSUES

Defendant raises nine additional issues that he concedes have previously been decided contrary to his position by this Court: (1) whether the short-form indictment was adequate to confer jurisdiction on the trial court to try defendant for first-degree murder; (2) whether the trial court erred by denying defendant's motion to prohibit the State from seeking and obtaining the death penalty against him; (3) whether the trial court plainly erred by instructing jurors they "may" consider mitigating circumstances rather than instructing them they "must" do so; (4) whether the trial court plainly erred by instructing the jury that it was to determine whether nonstatutory mitigating circumstances found by one or more jurors had mitigating value; (5) whether the trial court plainly erred in its instructions on mitigating circumstances in that the burden of proof is too vague to

be understood by jurors and the use of the term "satisfies you" imposes too high a burden on defendant, thereby precluding the jury from giving effect to all mitigating circumstances and violating the Eighth and Fourteenth Amendments to the Constitution of the United States; (6) whether the trial court plainly erred by instructing jurors that they had to be unanimous to impose a sentence of life imprisonment; (7) whether the trial court plainly erred by instructing the jury that it was required to determine that the mitigating circumstances were insufficient to outweigh the aggravating circumstances; (8) whether the trial court plainly erred by instructing the jury that it had a "duty" to find that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty; and (9) whether the trial court plainly erred by failing to instruct the jury that the State was required to prove beyond a reasonable doubt that the mitigating circumstances were insufficient to outweigh the aggravating circumstances.

Defendant raises these issues for purposes of urging this Court to re-examine its prior holdings and to preserve them for federal review. We have considered defendant's arguments on these issues and conclude that defendant has demonstrated no compelling reason to depart from our prior holdings.

## PROPORTIONALITY

[42] Finally, we consider whether the record supports the aggravating circumstances found by the jury, whether the death penalty "was imposed under the influence of passion, prejudice, or any other arbitrary factor," and whether defendant's "sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2010).

The jury found all three aggravating circumstances submitted: that the murder was committed for pecuniary gain; that the murder was especially heinous, atrocious, or cruel; and that the murder was committed while defendant was engaged in the commission of a rape. The evidence presented by the State during its case in chief fully supports each of these aggravating circumstances. In addition, nothing in the record of this case suggests that defendant's sentence was imposed arbitrarily or under the influence of passion or prejudice.

Concerning the proportionality of defendant's death sentence, we note that, in addition to the aggravating circumstances, at least

one juror found four statutory mitigating circumstances and at least one juror found two of the fifty-nine nonstatutory mitigating circumstances. In addition, no juror found the catchall mitigating circumstance.

In determining proportionality "[w]e consider all cases which are roughly similar in facts to the instant case, although we are not constrained to cite each and every case we have used for comparison." *State v. McNeill*, 360 N.C. at 254, 624 S.E.2d at 344 (citation omitted). However, the determination of proportionality of an individual defendant's sentence is ultimately dependent upon the sound judgment and experience of the members of this Court. *See id.* at 253, 624 S.E.2d at 344.

The aggravating circumstances found by the jury here are among those most commonly present when a sentence of death has been found proportionate. *State v. Bacon*, 337 N.C. 66, 129-31, 446 S.E.2d 542, 577-79 (1994) (Exum, C.J. & Frye, J., dissenting), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Of the four aggravating circumstances that, standing alone, have supported a death sentence, *see id.* at 110 n.8, 446 S.E.2d at 566 n.8 (majority), two were found here, that is, that the murder was especially heinous, atrocious, and cruel; and that the murder was part of a course of conduct in which the defendant committed a violent crime against another person. Moreover, defendant invaded the victim's home, where she had a right to feel secure. *See State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). In addition, this Court has affirmed death sentences after proportionality review in cases in which a codefendant received a life sentence. *See State v. McNeill*, 349 N.C. 634, 655, 509 S.E.2d 415, 427 (1998) ("We note that the fact that a defendant is sentenced to death while a codefendant receives a life sentence for the same crime is not determinative of proportionality." (citations omitted)), *cert. denied*, 528 U.S. 838, 145 L. Ed. 2d 87 (1999).

This Court has determined that the death penalty was disproportionate in eight cases. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*,

309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). Each of these cases is distinguishable from the case at bar. Defendant participated in a brutal, prolonged, and merciless killing. The sentence of death in this case is not disproportionate.

## CONCLUSION

Defendant received a fair trial and sentencing proceeding. We find no prejudicial error in his conviction or sentence. In addition, we find that defendant's sentence of death is not disproportionate.

NO ERROR